**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA,

      v.

JUSTIN DANIEL LOUGH,
JACOB MARK ROBARDS,

No. 4:17-CR-00139

(Judge Brann)

## MEMORANDUM OPINION

### MARCH 5, 2019

## I.  BACKGROUND

On April 11, 2017, criminal complaints were filed against Defendants Justin Daniel Lough (hereinafter "Lough"), Jacob Mark Robards (hereinafter "Robards"), and four other co-defendants who have since pled guilty.  An indictment was filed on April 27, 2017, which is now the operative charging document in this case.[1]

The indictment alleges that Defendants were members of the Aryan Strikeforce (hereinafter "ASF"), and as part of that organization, "engaged in criminal conduct to fund the activities of the ASF and the acquisition of firearms and ammunition."[2]  Count 1 charges all Defendants of Conspiracy in violation of 18 U.S.C. § 371 for various firearms dealings.  Counts 2 and 3 are irrelevant to the instant motions as they name only co-Defendant Davis.  Counts 4, 5 and 6 charge

---

[1]  ECF No. 12.

[2]  *Id.* at ¶ 9.

all Defendants except Davis with Interstate Travel in Aid of Racketeering Enterprises in violation of 18 U.S.C. § 1952(a)(3), specifically, conspiracy and attempt to distribute and possess with intent to distribute 500 grams or more of methamphetamine and money laundering.   Similarly, Count 7 charges all Defendants, except Davis, with Conspiracy to Distribute Controlled Substances, specifically 500 grams or more of methamphetamine, in violation of 21 U.S.C. § 846.

Counts 8, 9, and 10 charge all Defendants, except Davis, with Attempted Distribution of a Controlled Substance in violation of 21 U.S.C. § 846.  The amounts and dates charged as to the two moving Defendants, are as follows:  In Count 8, Defendants Lough and Robards are charged with attempted distribution of 16 pounds of methamphetamine on January 17, 2017.  In Count 9, Defendant Lough is charged with attempted distribution of another 16 pounds of methamphetamine on March 12, 2017.  Finally, in Count 10, Lough is charged with attempted distribution of an additional 16 pounds of methamphetamine on April 7, 2017.

Count 11 charges all Defendants, except Davis, with, Conspiracy to Commit Money Laundering in violation of 18 U.S.C. § 1956(h).   Counts 12, 13, and 14 charge all Defendants, except Davis, with Conspiracy to Commit Money Laundering in violation of 18 U.S.C. §1956(a)(3)(B).   Count 15 charges Steever, Baird, and Lough with Transport, Deliver & Receipt of Unregistered Machineguns

in violation of 26 U.S.C. § 5861(j). Count 16 is unrelated to the instant motions as it charges only Defendants Steever and Baird. Finally, there is a forfeiture allegation for the various weapons discovered by law enforcement.

On January 12, 2018, Defendant Lough filed a Motion to Dismiss the Indictment Based on Outrageous Government Conduct.[3] Thereafter, the motion was joined by Defendant Robards.[4] Lough next filed a Supplemental Motion to Dismiss the Indictment,[5] also joined by Robards.[6] Lough also filed a Motion to Suppress,[7] which Robards did not join.

All motions have been fully briefed, and a hearing conducted on December 10, 11, and 19, 2018. After careful consideration, the motions will be denied.

### A. The evidence presented at the hearing

The Government presented the case agent assigned to this matter, Federal Bureau of Investigation (hereinafter "FBI") Special Agent Kyle D. Moore (hereinafter "Agent Moore") to provide extensive testimony. Agent Moore was the only witness to testify. The Defendants, along with the Government, provided

---

[3]   ECF No. 126.

[4]   ECF No. 131.

[5]   June 18, 2018, ECF No. 190.

[6]   ECF No. 198.

[7]   October 19, 2018, ECF No. 232.

a stipulation as to the anticipated testimony of a confidential human source witness known only as "CHS 4."[8]

Agent Moore testified that the investigation was initiated because the FBI had received complaints that convicted felons were attempting to obtain firearms in Potter County, within the Middle District of Pennsylvania. Additionally, the FBI had received intelligence that the ASF, a white supremacist organization with members across the globe, was planning an IED[9]/bomb plot.

These two seemingly disparate pieces of intelligence were linked, however, because one of the convicted felons in possession of firearms was Ronald Pulcher ("Pulcher"), then president of the ASF. The FBI began investigating to determine, in part, if one or more convicted felons in possession of a firearm. That said, the initial thrust of the investigation was to ensure that the agency gained intelligence on the potential bomb plot and thwart it. To achieve this objective, the agency utilized an undercover employee, hereinafter "UCE 1," to infiltrate the ASF.

Agent Moore testified that the goal of the ASF is to protect white individuals and their children. The Government played a video[10] co-Defendant Joshua Steever ("Steever") produced and uploaded to YouTube.com that explained the organization and its aspirational goals. Both Defendants Lough and Robards were

---

[8]   ECF No. 320 at 4-6.

[9]   Improvised explosive device.

[10]  Government Exhibit 1.1.

featured in photographs in the video. The video referenced both white power and the Nazi regime, including images of swastikas. Additionally, Agent Moore testified that the ASF claims to be affiliated with Combat 18, a violent, white supremacist organization in the United Kingdom. CHS 4 asserted, in the stipulated testimony, that the ASF is not affiliated with Combat 18.[11]

The Government also displayed 'screenshots' of the ASF's website. The mission of the ASF is listed as follows:

> The Aryan Strikeforce is a white nationalist organization that is reputable as a defense league with several main purposes as a foundation that shall never be compromised under any conditions or circumstances. Our goal is to protect the honour of our women, children, and the future of our race and nation. The Aryan Strikeforce's main goal is to provide today's adolescence, an alternative to this failed State of a Zionist eroded government We will educate our youth about their culture and heritage. As well as teach our race to feel pride for who they are. We will educate the masses about the preservation of our race, heritage, and our way of life. We will show them real life examples about how Zionism has slowly eroded our bloodline, morals, and values. By organizing our race and strengthening our selves physically and mentally we will Not tolerate Red trends imposing upon on lineage and nations we are the few who are qualified and prepared for when the time comes to regain our once great, but now fallen, nation.The Aryan Strikeforce is a white nationalist organization that is reputable as a defense league with several main purposes as a foundation that shall never be compromised under any conditions or circumstances. Our goal is to protect the

[12]

Agent Moore testified as to the ASF's prospecting procedure and the qualifications for a prospect to become a member. He explained that the ASF wanted "to avoid having law enforcement join." The ASF had an application for prospects to fill out. It is set forth, as follows:

---

[11]   ECF No. 320 at 5.

[12]   Government Exhibit 1.3.



# Aryan Strikeforce
## Whatever It Takes!



Full Name: _____

Alias Used: _____

Mailing Address:_____City:_____
State:_____ Zip Code:_____ Telephone Number: _____

Email Address: _____

Marital Status: _____ Spouse's Name:_____

Ethnicity/National
Origin:_____

Date of Birth:_____ Sex: Male ~ Female ~ Height: _____Weight: _____
Eye Color: _____ Hair Color: _____

Religion of choice:_____

Do you use an non prescribed narcotic drugs?_____

Have you ever been affiliated (or currently affiliated) with any WN/NS organization?_____

Level of highest education:_____

Have you ever served in the armed forces? If so, what branch?_____

Discharge: Honorable ~ Dishonorable ~ Dates - From: _____ To: _____

Criminal Record:Yes ~ No ~ Felony: Yes ~ No ~ Misdemeanor: Yes ~ No If yes on criminal
charges, (please specify): _____

Signature:_____     Date_____

**U.S. v. LOUGH & ROBARDS**
**GEX 1.3.4, Page 1**

13

---

13   Government Exhibit 1.3.4.

After six years of being a "supporter," prospects could then become a "patched member." Agent Moore testified that "when you're a patched member of the organization it means that you are a full-fledged member of the Aryan Strikeforce." There is a physical patch that members receive and display on black bomber jackets. In addition to the patch, members had to take a "blood oath" and have the ASF symbol tattooed on their body. The blood oath reads as follows:

71556

**BLOOD OATH**

Tell your prospect to take a knee and hand them the patch. I _____ Swear that I will always remain loyal to my brothers and sisters within the Aryan Strikeforce. I swear that I will fight and die for my race, my nation, my brothers and sisters I will never surrender to anyone who stands against us. I will strive at all costs to achieve for the Aryan Strikeforce a perpetual nation. Against all odds. I swear that in my fight to secure the existence of our people and a future for our children that I will do whatever it takes to lead our organization to victory. I swear that as a righteous soldier and national socialist I will fight with upmost perseverance and uphold myself nobly and courageously never to endanger my brothers and sisters and to always place the Aryan Strikeforce's foundation's and achievements ahead before my own life. I solemnly swear upon this patch my life my duty to my nation and race, and to my officers before me, I will shed blood or have blood shed as my predecessors have done before me. I will obey and keep to me a oath of fidelity to the Aryan Strikeforce and will conduct myself with wisdom and strength and warrior valor I will keep a strict Code of Silence concerning matters of the Aryan Strikeforce. Prick your prospects finger and have them place their finger on the patch On the blood of my ancestors, and to my God(s) I swear this Blood Oath. After this everybody including the new patch holder gives a straight arm salute and yells: Hail Aryan Strikeorce! Hail Combat 18!

( ALL MEMBERS ARE REQURED TO HAVE THE PATCHED TATTOOED)

14

At the time of the investigation at issue, the President of the ASF was Pulcher and the Vice President was co-defendant Steven Daniel Davis ("Davis.") Steever is also the founder of the ASF. Agent Moore testified that Steever was "very internet savvy and was able to recruit members [] overseas []."

---

[14]   Government Exhibit 1.4.

UCE 1 was introduced to the group through a confidential human source ("CHS"). Initially, the ASF members who were introduced to UCE 1 were interested in his ability to supply firearms. Agent Moore testified that UCE 1 was introduced to Steever and Pulcher "essentially to continue the investigation to find out what the organization was up to, whether the information that we did receive previously was correct; that the individuals within the Aryan Strikeforce were looking to acquire illegal firearms to conduct tactical training, as well as flesh out whether there was any real potential of a bomb threat." CHS 4 "said that any talk about a bombing plot was likely 'bullshit' between guys sitting around and drinking."[15] "CHS 4 said that he/she doubted any of them would have known how to build a bomb."[16]

Agent Moore also provided testimony about the investigation as to the potential bomb plot:

> [B]ased off the undercover's discussion with Steever, the discussion was about one of the members of the organization, Joseph Erash, essentially was in bad health. Joseph Erash had talked about the fact that he wanted to go out with a bang and there had been a discussion about Joseph Erash essentially taking an oxygen canister to potentially a rally in Harrisburg potentially, ANTIFA[17], as essentially a target and detonate himself. So the undercover's discussion with Steever also we're trying to sort of flesh out those details.

---

[15]   ECF No. 320 at 4.

[16]   *Id.*

[17]   ANTIFA, according to internet research, is "a political protest movement comprising autonomous groups affiliated by their militant opposition to fascism and other forms of extreme right-wing ideology."

UCE 1's infiltration of the ASF confirmed that Pulcher was indeed a convicted felon in possession of firearms. When UCE 1 arrived at Pulcher's home, Pulcher shot into the air with a pistol to greet UCE 1. UCE 1 discovered that Davis had provided the firearms to Pulcher. For his/her part, CHS 4 denied that anyone had "ever fired any guns when he/she was at [Pulcher's] home."[18]

The investigation involving Pulcher was short lived, as he was arrested on state charges for growing marijuana and possession of illegal firearms in late October 2017. However, Agent Moore testified that sometime prior to Pulcher's arrest, Pulcher and Steever discussed with UCE 1 "the idea that they wanted to form the service unit." Agent Moore explained a 'service unit' as such: "Essentially it's a smaller group of individuals, you know, who come together to you know essentially -- Ronald Pulcher sort of described it as the elite, members who were formed in order to conduct operations which may be you know criminal or violent in nature." On cross-examination, Agent Moore was asked "There was a proposal made by a confidential human source to Pulcher and Steever to set up a service unit?" to which he replied "I'm unaware of who originated the plan or idea of a service unit. I just -- I just understood that this was a goal of theirs."

The investigation continued with Steever as UCE 1's point person within the ASF. Many of the calls, text messages, and body wire audio/video recordings

---

presented at the hearing were conversations involving Steever. The Government introduced much of this evidence involving Steever to establish, in its favor, the elements of a motion to dismiss for outrageous government conduct: that it was infiltrating a previously existing criminal enterprise, that the Government did not instigate/originate the crime, nor did it control its operations. Conversely, the defense utilized many of the same exhibits to make its point, as to those same elements, in favor of the defense. Thus, although co-Defendant Steever pled guilty on April 24, 2018, and Defendants Lough and Robards are the movants here, a large portion of the discussion in this memorandum opinion involves Steever, as he was the primary contact between the UCE and the ASF.

On October 20, 2016, UCE 1 and Steever spoke on the telephone.[19] Steever told UCE 1 about a friend, Frank Maddox ("Maddox"), who was coming up from Florida to stay with Steever at his Phillipsburg, NJ residence. Maddox would be arriving with an AR-15 rifle and Steever was discussing how to hide it because Steever did not want to be found in possession of a rifle by his probation officer. Steever wanted Maddox to be part of the service unit, saying he wanted Maddox to be the "top enforcer" but ultimately, on the drive from Florida to New Jersey, Maddox was stopped and arrested for possession of marijuana and the authorities confiscated his weapon. UCE 1 asked Steever if he and 'Dozer' (Pulcher) had

---

[19] Government Exhibit 1.15.

decided who their team (service unit) was going to be; Steever explained that he had it "all lined up."

During a November 6, 2016 call,[20] Steever told UCE 1 that Davis became president of the ASF in the wake of Pulcher's arrest. Steever explained that he, Davis, and Robert McFall, a patched member, had been discussing the service unit. Additionally, Steever explained that co-defendant Conner Dykes ("Dykes") would be part of the service unit.

During a November 15, 2016 phone call[21] between UCE 1 and Steever, Steever discussed a gun, which UCE 1 told him not to bring to an upcoming November 19, 2016 breakfast meeting at a Cracker Barrel restaurant in Staunton, Virginia.

On a November 16, 2016 phone call between UCE 1 and Steever, we hear references to Lough for the first time.[22] Steever tells UCE 1 that Davis will not be at the meeting because there had been a falling out between Davis and McFall. Steever was loyal to McFall, and at the time, the ASF wanted to pull Davis's patch and kick him out of the organization. Steever explained that there was concern that Davis was providing information to outsiders about the service unit. Steever told UCE 1 that instead "two guys from Virginia are going to be there" at the Cracker

---

[20]   Government Exhibit 1.15.

[21]   Government Exhibit 1.15.

[22]   Government Exhibit 1.15.

Barrel meeting. Steever said the men were "my bro Hellbilly"[23] and "my bro Rocko." Rocko is the nickname for Lough. UCE 1 asked if "Hellbilly is [] all right then?" Steever responded that "Rocko is a great mother fucker I trust him with a lot of shit." UCE 1 replied "ok." Steever continued, "And Hellbilly is Rocko's best friend." Steever later explained that "Rocko's the one that brought Hellbilly in and patched him." UCE 1 asked if "one of them" had a car, "because [Davis] had a car." Steever explained that Lough and Hellbilly had cars and good jobs.

Because the FBI had not heard Lough's name previously, agents researched Lough. Agent Moore found Lough's social media postings on both Facebook and VK. Agent Moore explained that "VK is essentially the Russian equivalent of Facebook. You know one of the reasons why they flock…used VK rather than Facebook, when you post racist imagery on Facebook your account is likely to be taken down and suspended, as opposed to being able to do it on VK they have a little bit more freedom to be able to do that." Lough operated his Facebook account under the name "Rocko Gambino" and his VK account under the name "Dirty Dog."

The research indicated to the investigators that Lough was an active ASF member, and possibly a member of Combat 18 as well:

---

[23] Jeremy St. Clair.



**Dirty Dog**
19 Jul 2016

So apparently the other day there was a Black And Blue Lives Matter walk in my shitty little town. Nigs and pigs walking around together fuckin hilarious i wish theyd kill eachother off

[24]



**Dirty Dog**
7 Sep 2016



[25]

---

[24]  Government Exhibit 1.12.1.

[25]  Government Exhibit 1.12.2.

**Dirty Dog**
I hope you get AIDs

last seen yesterday at 11:49 pm

| | |
|---|---|
| Birthday: | August 13 |
| Current city: | Tucson |
| Relationship status: | Single |
| Company: | Aryan Strikeforce/Combat 18 Vinland |

26

**Personal information**

Groups:   Aryan Girls, Terror Machine Tattoo, Aryan Strikeforce Combat 18 Australia, Aff-aryan-front-fighter international, Aryan Strikeforce Combat 18 International, Nazi Punks Skins, Louisville Underground Music Archive sets out to, Terror Machine Productions, Tattooed Mother Fuckers, White Lives Matter, Aryan Nationalist Alliance, Blood Honour Combat 18 Vinland, Combat 18, Aryan Strikeforce Combat 18 Russia, group is a backup link AS C18

show full list

27

Lough's VK page contained a photograph dated July 16, 2016 of Steever (pictured on the left) with Lough (pictured on the right):

---

26   Government Exhibit 1.12.3.

27   Government Exhibit 1.12.4.



28



29

28 Government Exhibit 1.12.5.

29 Government Exhibit 1.12.6.

The FBI also discovered what appears to be Lough's only prior contact with law enforcement. In 2010, the Waynesboro, Virginia Police Department opened an investigation about "white power, swastika, and white supremacist graffiti" in the city's park.[30] The officers found references to the Nazi movement, together with other white power movements, in Lough's apartment and displayed prominently on the door to his apartment.[31]

After speaking with Lough himself, the Waynesboro police officer continued her investigation by speaking to Lough's former girlfriend. She explained she dated Lough for a few months, but he broke up with her through text stating "Hammerskin bros come first can't be together." The Hammerskins are another white power organization. Lough's former girlfriend relayed that Lough said he would "beat up" black people. The officer also interviewed a friend of Lough, who Lough tried to recruit to join the Hammerskins. Lough's friend explained that he did not join the group, stating that "it was a bunch of guys standing around a big fire yelling the N word which when asked was "Nigger" and yelling white power and drinking."[32] A third friend of Lough's told the officer that

---

[30] Government Exhibit 1.13.

[31] This is discussed in further detail in section IV below.

[32] Government Exhibit 1.13 at 5.

Lough had tried to recruit him to be a Hammerskin and told him that "in order to build trust he would have to carry meth for other people in the skinheads."[33]

Between November 16, 2016 and November 19, 2016, Steever and Lough engaged in several text messages prior to the Staunton, Virginia Cracker Barrel meeting. Specifically, Steever relayed to Lough the meeting location, time, and date. [34]

On November 19, 2016, the Cracker Barrel meeting took place, as noted above. Although the remaining meetings with undercover officers were recorded with a body wire, and it was the intent to record this meeting, as well, the recording failed due to equipment malfunction. The information regarding this meeting comes, instead, from a form FD-302 (hereinafter referred to as either a "302," "302 form," or "FBI 302,") that the undercover employee subsequently completed on November 21, 2016.[35]

Present at the Cracker Barrel meeting were Steever, Dykes, Lough, an unidentified participant, and UCE 1. The 302 reads as follows, in relevant part:

---

[33] *Id.* at 6.

[34] Government Exhibit 1.14.

[35] Government Exhibit 2.1.

UCE and ▓▓▓▓▓▓ explained that UCE had a business opportunity that involved transporting an item from point A to point B. UCE and ▓▓ ▓▓▓▓ explained that those ASF members would merely be acting as "muscle" and provide an additional vehicle to act as security for UCE and ▓▓▓▓▓▓▓. ▓▓▓▓▓▓▓ told the ASF members that it did not matter what was in the bag and that we weren't selling anything, further explaining that we merely provide transportation.

At this point subject JUSTIN LOUGH expressed his concern and asked if UCE or ▓▓▓▓▓▓ could provide him with a "piece", meaning a firearm. UCE explained that a "piece" was not needed and it would be bad enough if UCE, ▓▓▓▓▓▓ and those ASF members got stopped by the police merely

transporting the product and arrested that the possession of a firearm would only make it worse and result in additional jail time.

As an additional response to this request about a firearm by JUSTIN LOUGH, ▓▓▓▓▓▓ explained to the ASF members that there was a possible firearms deal set-up as well and that if the ASF provided this assistance to UCE and ▓▓▓▓▓▓ there would be money available and that a deposit should be placed to solidify this potential firearm deal. ▓▓▓▓▓▓ and UCE explained that the firearms guy did not want cash and preferred pre-paid credit cards as a method of payment.

Subject CONNER DYKES indicated that he had to check with his wife before he could make a commitment to assist UCE and ▓▓▓▓▓▓. CONNOR DYKES also said that he could drive, but added that his Honda Accord has about 285k miles on it. CONNER DYKES said that he has off work on Sundays.

Subject JUSTIN LOUGH said that he was able to assist UCE and ▓▓▓▓▓▓ and that he had off of work each week from Friday through Sunday. JUSTIN LOUGH also explained that he had a smaller Ford SUV and that he could act as the driver.

UCE explained to subject JOSHUA STEEVER that the ASF members would have to meet UCE in the area of Newburg, New York and that the transport would entail driving west on Interstate 84 to the area of Scranton, Pennsylvania.

UCE explained to the ASF members that UCE should be able to pay each member about $1,000 for their assistance. At the same time ████████████ once again suggested that each ASF member needed to change $500.00 of that

payment into a pre-paid credit card if a deposit was to be placed for the potential firearms deal.

UCE explained that there were no issues if the ASF members did not want to assist and that because of the possibility of jail time they all needed to make sure it was something they wanted to partake in. UCE explained that the transportation would most likely occur the weekend after Thanksgiving. UCE explained to subject JOSHUA STEEVER that since those ASF members were "his guys" UCE needed an answer whether or not the ASF members were willing to assist UCE and ████████████ by early in the coming week. UCE directed JOSHUA STEEVER to call UCE Monday with that answer.

During this open conversation, which occurred over breakfast at the Cracker Barrel, ████████████ and ROBERT McFALL left and went outside to smoke a cigarette. ████████████ later told UCE that he told ████████████ that methamphetamine is what was being transported. ████████████ told UCE that ████████████ acknowledged, and further said that he had done stuff like this in the past. ████████████ also indicated that ████████████ told him he would explain to those other ASF members that methamphetamine was involved.

At the conclusion UCE and ████████████ once again told all of those ASF members that they needed to make certain this was something they wanted to participate in. UCE again confirmed with JOSHUA STEEVER that UCE needed and answer early in the next week confirming, or declining their participation.

Agent Moore testified that UCE 1 told Lough not to bring a firearm because "Certainly it was a safety issue. If an individual had brought a gun… obviously we try to control the situation as much as possible considering the safety of everybody

involved. So in this case, the instruction was to not bring a firearm with any of the members." Agent Moore continued, "To ensure that the public safety is always at the forefront to make sure that you know, as much as we can -- sometime it's not possible but we try to control it has much as we can to protect the public and so in this case you know, we tried to set certain parameters to be able to at least place, you know, public safety foremost in the picture."

Preceding what was later described by the parties as the first 'run,' of methamphetamine, UCE 1 and Steever had several phone calls.[36] On November 21, 2016, Steever told UCE 1 that McFall suggested taking three cars on the run instead of two. UCE 1 said he would talk to someone else about that and get back to Steever. On November 27, 2016, UCE 1 and Steever discussed what date would work best for the run. On November 30, 2016, Steever told UCE 1 that "we're gonna have fucking Rocko drive because [Dykes is] having car problems." On December 3, 2016, during the final call prior to the first run, Steever told UCE 1 that Lough was waiting for someone to send him money for gas.

The first run then took place on December 4, 2016 memorialized in a 302[37]and recorded by UCE 1's body wire.[38] Significantly, none of the alleged

---

[36]   Government Exhibit 2.5.

[37]   Government Exhibit 3.1.

[38]   Government Exhibit 3.2.

conspirators were charged in the indictment for their participation in this first run of methamphetamine.

The ASF members and UCE 1 met at a gas station in the area of Lords Valley, Pennsylvania. Steever rode in a vehicle with UCE 1, and McFall, Lough, Dykes, and a CHS rode in Lough's vehicle for the hour drive to the Dickson City Mall near Scranton.

The video taken from UCE 1's body wire en route to the mall is particularly damning. It displays UCE 1 explaining to the participants that they would be paid to be security for a sale of crystal methamphetamine.[39] The participants were thrilled to be paid for their participation in the run.[40] UCE 1 tells Dykes, Lough, Steever, McFall and a CHS that:

UCE 1: The long and short is there is a minimum of eighteen pounds of crystal in the back of my truck.

Lough: No shit!

UCE 1: No shit.

Lough: Wanna get high? (Laughing)

UCE 1: Ah. So we're not all in responsible (UI)[41] from getting it from A to B. Ah…The dude is going to pay us ten (UI). You'll think I'm a dick but John and I are doing six and each will get one a piece.

Dykes: One what?

---

[39] The drugs UCE 1 was carrying were not real but instead was simulated crystal methamphetamine.

[40] *Id.*

[41] "UI" stands for unintelligible.

UCE 1: One thousand.

Dykes: Each a thousand? You're shitting me. I really wanna hug you right now.

UCE 1: (UI)

Lough: I think I want some of your crystal.

UCE 1: Yeah. Yeah. No, but everybody's on the same page now?

Dykes: I want to buy an XBox.

*****

Steever: Fucking…Like I was going to carry today but I left that fucking twenty-two at my dad's. I didn't wanna take a chance fucking carrying.

*****

Steever: Is there any way to get the money off the cards?

UCE 1: Well the dude. If you guys wanna, you don't gotta do it all, but if you want to do the deposit for the shit John lines up. He doesn't want cash is the problem. He wants…He likes the pre-paid cards because I guess you can't track e' m and shit.

Steever: Yeah.

UCE 1: So you don't. I mean you don't got to do it all.

UCE 1: Yeah. No. Don't do it all. I mean don't do any of it if you don't want. Ah. I.I. just know that's what I'm doing later cause that's what he wants. Otherwise we can just re-group up here and that's that.

Once the group arrived at the mall, they found the alleged recipient of the

simulated crystal methamphetamine, another UCE, identified as UCE-7244-SAC.

The other UCE gave UCE 1 a bag of money and Steever provided the purported methamphetamine to the other UCE. UCE 1 paid each of the participants with the promised $1,000 each. The participants then had a discussion as to whether to buy gift cards with their $1,000 to use as down payment on a firearm from a firearms dealer UCE 1 purported to know. The 302 memorialized what happened as follows:

> UCE and [CHS] suggested that each of those subjects utilize a portion of that USC [United States Currency] to purchase a pre-paid Visa card that would in-turn be provided to a gun supplier as a deposit for a forthcoming gun transaction being set-up by UCE. After some discussion, and attempts by Joshua Steever, to further explain the need for the pre-paid Visa cards, those ASF subjects declined, and instead opted to keep all of the USC. UCE then accompanied all subjects to a restaurant for lunch.

Agent Moore's testimony further explained the choices made by the Government in this and future runs. First, Agent Moore explained that real drugs were not used during the staged transaction. He stated, "It was simulated methamphetamine. And again, the reason is for public safety, you know, I believe by DOJ policy we are not able to actually use live drugs in a transaction." He further explained, "It could be -- if for whatever reason those drugs got out into the public's [UI], they could be used and potentially could kill somebody."

The prosecutor also asked Agent Moore the following:

> Q. I have a question for you. In conducting this investigation, why not just stage a sale of a firearm to the individuals that you've identified that were interested in acquiring firearms for service unit activities?

A. At the time they had indicated that they didn't have the money together to be able to purchase a firearm. Also, the sale of firearms becomes a little bit dicey given the fact that given the fact that as an investigator you never want to turn over live firearms to an individual just based off again public safety. If a live firearm is then given over to an individual for sale, there is always the possibility that somehow they could use it.

After the first (uncharged) run described above, there were several telephone conversations recorded by UCE 1. On December 7, 2016, UCE 1 and Steever engaged in the following exchange:[42]

> UCE 1: If he's got another ah…Another business game…Ah if you guys are still into it again.

> Steever: Yeah.

> Steever: Yeah, we are. We are.

> UCE 1: Work's pretty easy so I mean it ah…I, I don't know how he would ever do it cause I never known him to have that much work before Christmas but I don't know. Like I said he doesn't tell me a whole lot on the phone, so.

> Steever: Yeah, we already talked about that and fucking we're all ready.

Then on December 8, 2016, UCE 1 and Steever had another telephone conversation regarding the upcoming second run:[43]

> UCE 1: The dude up here ah…Has some more shit lined up so. I, I told him, I said yeah. Ah…The dude's that we went with last time would probably be into doing some work again so. He was good to go. Ah…He was thinking probably like after Christmas and shit.

> Steever: Yeah, that was what John was saying.

---

[42]  Government Exhibit 3.2.2.

[43]  Government Exhibit 3.3.3.

UCE 1: Yeah, so I'm like yeah that works for me. Ah…I said I'd check with you guys to make sure it worked with you.

Steever: Fuck yeah.

UCE 1: Probably like…

Steever: (UI) fucking perfect.

UCE 1: Yeah, probably unless he wants to try to do something like. I don't know…

Steever: I talked to Conner about it.

UCE 1: OK.

Steever: I talked to Conner earlier and he said he's still up for it.

UCE 1: He's good with it?

Steever: Yep.

UCE 1: Um…And then what about Rocko [Lough]? He was fine…He was like a fucking maniac that day. (Laughing)

Steever: Yeah.

UCE 1: Yeah.

Steever: And Rocko's [Lough's] good for it too.

UCE 1: Yeah.

Steever: And Rob is of course.

*****

Steever: And I talked to…I talked to Conner about the cards too. And I told him next time make sure he puts money on the card.

UCE 1: Yeah, cause he was like…I mean you. I think you went to go take a piss or some shit and he…He said he wasn't even sure what we were doing until like a couple hours beforehand and he was all excited that he know what we were doing and, but. I tried to talk to him quick about the cards but I don't think got it. I mean obviously he didn't fucking get it. You know what I mean?

Steever: No, yeah.

UCE 1: Ah…

Steever: All the guy…All of e' m were all confused.

UCE 1: Yeah, I mean I could tell you were trying to push e' m but at that point whatever. I mean I didn't wanna sit around with the cash in the back of the truck. I wanted to get the fuck out of there.

Steever: (UI)

UCE 1: Ah, but no if they're cool with it (UI)

Steever: (UI) next time I may have them do it.

UCE 1: Well, yeah. If they're cool with doing it next time cause we covered it so.

Agent Moore testified at the hearing that "work" references the illegal transport of methamphetamine for payment.

On January 4, 2017, Steever and UCE 1 had another telephone conversation. Steever discusses bringing "Boots" (Robards) along for the next run.[44]  This is the first reference to Robards.

Steever: And then my bro. Boots [Robards] got in in the morning. I picked him up from the fucking Greyhound station at nine o'clock.

---

44   Government Exhibit 3.4.

UCE 1: That's what I thought you said. Wasn't he the guy you said from out in like Cali or some shit that you said was coming back?

Steever: Yeah.

UCE 1: A little bit ago.

Steever: Yep, yeah.

UCE 1: Is he…He's gonna be down with this then? Or are we leaving him out of it?

Steever: We can get him involved if you want. He's a good guy. He's solid as hell. He did shit with me before.

UCE 1: Ah…

Steever: And nothing got out. He did shit with fucking (UI)

UCE 1: (UI)

Steever: Really high, really big people with me.

UCE 1: Yeah, I mean… I mean if…

Steever: Big people.

UCE 1: If you trust him, I trust him. I mean I trust you. I guess the problem is going to be if we got too many people. There's not going to be enough money to go around.

Steever: Yeah. Just in case we can't get Rob, we have a backup.

*****

UCE 1: How's ah…Conner and like Rocko [Lough] are good still? I haven't…I don't talk. I guess (UI) talk to them.

Steever: Conner….Conner is excited.

UCE 1: OK.

Steever: We just…We just promoted fucking Conner too.

UCE 1: You promoted Conner?

Steever: Yep, he's our Sergeant at Arms now.

UCE 1: Cool. Well (UI) Does he know what the gift cards mean then this time? (Laughing)

Steever: Yeah.

UCE 1: Yeah, Rob and I talked about that. I told him.

Steever: Yeah, Rob said they were all confused.

UCE 1: Yeah.

UCE 1: Ah…

Steever: He said he was confused because of fucking John (Laughing)

UCE 1: Well, yeah John confused me for a minute too because he had the deal quasi set up and then…I mean I ended up taking it in the ass there and having to pony up some money, but whatever. If everybody knows what's what and you wanna do it…

Steever: Yeah.

UCE 1: It's still there, so. Ah… Well do me a favor then. Call…I don't know who's got a car now. I guess Rocko does still. Um…

Steever: Rocko…and…Rocko does and then like fucking Conner still has his.

*****

UCE 1: Otherwise because if Rob can't do it I guess if you trust this Boots dude. Ah…

Steever: Yeah, I trust him. And like the people I've met had him work before.

On December 10, 2017, Steever and UCE 1 had another phone conversation:[45]

Steever: Hey bro.

UCE 1: Yo bro, what up?

Steever: Nothing much. I talked to Rocko [Lough].

UCE 1: Oh OK. Is he good?

Steever: Yep.

UCE 1: Cool. So yeah. I. I called Rob quick cause he text me. He said Conner is out Rocko's in?

Steever: Ah yeah, Rocko's in and fucking Conner fucking can't get no one to cover for him at work.

UCE 1: OK and Rocko is good getting up early enough to get up to get you?

Steever: Yep.

UCE 1: OK. Is he getting Rob too or just you and…You and your buddy?

Steever: Just me and Boots [Robards] because he can't fucking drive all the way up to New York because it's fucking like five and five hours from my house.

UCE 1: Yeah, I told Rob that. I'm like that's your problem. I can't do anything about that.

---

45   Government Exhibit 3.5.

UCE 1: Yeah, cause it'll be quick and easy again. It ain't gonna be an all-day affair.

Steever: Yeah.

UCE 1: It'll be like last time. We'll be done by like lunchtime.

*****

UCE 1: Well, I mean see what…See what he says. Try to get ahold of him. See what's what. I mean otherwise you, Rocko and Boots is your…Your buddy from Cali right?

Steever: Yeah.

UCE 1: The guy that's there?

Steever: Yeah, yeah.

UCE 1: And he's…He's good?

Steever: Yeah and he's right here.

*****

Steever: Rocko was like (UI)

Steever: Because Rocko don't want to fucking pull another all nighter. Ah, because he's like fuck. He was like it was hard enough for me to fucking get home (UI) with no sleep.

*****

UCE 1: What is it? Like what cancer of what? [Regarding Robards' cancer diagnosis]

Steever: I don't know. Ah. He's down stairs I would ask him.

UCE 1: Hmmm.

UCE 1: Yeah, that's shitty (UI)

Steever: (UI)

Steever: Second and third stage right now.

UCE 1: Oh, really. Fuck! So he's…He's cool doing this though?

Steever: Yep. Yep, he already…

UCE 1: OK.

Steever: Said like this is nothing. He's so used to shit like this.

UCE 1: OK. Well, no. If you told him what was what and…

Steever: Yeah.

*****

UCE 1: I was just worried about you guys. What the whole car situation but if Rocko's good.

Steever: Yeah.

UCE 1: Then we're dialed in. We're good.

Steever: Yeah, Rocko told me he's definitely coming.

UCE 1: Cool, and his car's good? Yeah, he said his car is good before, that time.

Steever: Yep. Yep.

UCE 1: Yeah.

Steever: His car is fucking real good. Ah, fucking Conner needs to fix the starter on his.

UCE 1: OK.

Steever: It was banging the other day, yeah.

UCE 1: And Rocko's got a legit license? He's good if he gets stopped.

Steever: Yep.

The second run (the first the Defendants were charged with in the indictment) took place on January 17, 2017. UCE 1 recorded the following conversation with Steever during the drive for this run, copied in relevant part only:[46]

UCE 1: Were they down with gift cards this time? Or don't you know?

Steever: Yeah

UCE 1: What you wanna do?

Steever: Yep.

UCE 1: OK.

Steever: John told me four hundred dollars for four.

UCE 1: Four is cool yeah, that will make up for some of the shit from last time.

Steever: John told me, can always ask for more.

The 302 for this run was completed by another UCE, whom I will refer to as UCE 2.[47] UCE 2 was waiting in the parking lot of the Crossing's Outlet Mall in Tannersville, Pennsylvania, when the first vehicle with Lough, Dykes, and Robards arrived. Shortly thereafter, UCE 2 and Steever arrived in a separate

---

[46]   Government Exhibit 4.3.1.

[47]   Government Exhibit 4.2.

vehicle.  UCE 1 provided UCE 2 with the simulated methamphetamine; in return, UCE 2 gave UCE 1 a bag containing $10,000 in cash.

After the second run, Lough became increasingly interested in getting further work from UCE 1.  In fact, Lough reached out to UCE 1 to request work Lough could do alone.  On February 11, 2017, Lough texted Steever "Ask Russ [UCE 1] when we are going again."[48]  On February 12, 2017, Lough and UCE 1 spoke on the phone, transcribed here in relevant part only,[49]

> UCE 1: What's going on with you, man? You've been like off the grid supposedly.

> Lough: Me? See I've tried texting Hatchet nobody, nobody texts me back.

> UCE 1: Eh I mean, I didn't have your number, I mean I wasn't gonna break anybody balls to get it, 'cuz I gave you mine there but, I mean. (OV)[50]

> Lough: Right.

> UCE 1: Josh, Josh has said you've been like fucking like M-I-A, like he's concerned about your shit, is everything good?

> Lough: Yeah, everything's good for me. Just kinda struggling a little bit.

> UCE 1: Right. Uh, I gotta talk to him (OV).

> Lough: (UI).

> UCE 1: What'd you say?

---

[48]   Government Exhibit 4.4.

[49]   Government Exhibit 4.5.

[50]   "OV" stands for overlapping voice

Lough: I said I think that's the name of the game, though (Chuckle).

UCE 1: Yeah, like a fucking squirrel trying to get a nut, never fucking ends, eh?

Lough: Fucking A.

UCE 1: I talked to uh, I talked to Mark, the dude we met there for that uh, those couple beers there at the end and food. Uh.

Lough: (UI).

UCE 1: Yeah, uh, I told Hatchet I'd give him a shout but probably like it might be a smaller job, but like maybe a couple weeks.

Lough: Yup.

UCE 1: So depen, depending where you're at and stuff but, yeah I don't, I don't know that the deal is, but like I said Hatchet was like, all fucking twisted up man 'cuz you're like not responding, supposedly.

Lough: Oh, that's weird as shit. (Chuckle)

UCE 1: I don't know like I said it ain't my, it ain't my beef or my job, I'm just telling ya.

Lough: Right.

UCE 1: So.

Lough: Shit, when you say uh, smaller job, what's the, what's the paycheck like?

UCE 1: Uh, it, probably not the hourly rate that we did last time.

Lough: Oh.

UCE 1: But it'll be close, I'm thinking.

Lough: Oh yeah?

UCE 1: Yeah.

Lough: Do you have anything uh, where you don't need the others, might just need me?

UCE 1: Uh, I mean I'd have to do some poking. Um.

Lough: Oh.

UCE 1: 'Cuz I was with the guy this, I was with Mark this weekend. The guy there at the end. Uh, not the dude we had lunch with but the other guy we had the beers with.

Lough: Yeah.

UCE 1: Uh, doing some running around, but uh, I guess it depends. Yeah, if, if, if you got like your tools[51] and shit, and you can travel I can try to set something up.

Lough: Yeah, always down.

UCE 1: Okay, uh let me, let me think and do some poking around. Uh, (OV) to see what's what. It might.

Lough: (UI)

UCE 1: What's that?

Lough: Huh? I need to make some uh, I guess make some quick money and then pay (UI).

UCE 1: Didn't hear ya, what'd you say? You there?

Lough: Yeah I'm still here.

UCE 1: I didn't hear ya, quick yeah, I'm looking to flip some quick money too. But what'd you say about, what?

---

[51] Agent Moore testified at the hearing that "tools" is a euphemism for guns.

Lough: Oh, I said uh, I need to make some quick money here fucking pay off (UI) and I'm trying to make the rest of the cash and like get the fuck outta here. Go back to the west coast.

*****

Lough: Shit fucking uh, I don't know man if you could, if you have any work you could kick down this way? We can make uh, pretty nice work on some side work down here.

UCE 1: Eh, is there anybody down there though, that we could set up a crew with, or just you? I mean.

Lough: I would I mean, you usually, for me it's just, I kinda do better solo or with maybe one other person. But, a whole shit load of people it's like, eh, makes me uneasy.

UCE 1: Yeah, no I'm with ya. It's easier just to get you done, if you trust the guy you're with, yeah. And you're ready to.

Lough: Yeah.

UCE 1: To put the hours in and put the time in.

Lough: Exactly.

*****

UCE 1: Fucking, that sucks. You're uh, so what like schedule wise then you're pretty flexible then, I'm taking it?

Lough: Very, very, very flexible, especially when it comes to side work.

On February 20, 2017, in a follow up to the prior conversation, Lough

engaged UCE 1 in the following text message exchange:[52]

52   Government Exhibits 5.4 and 5.4.1.





UCE 1 ultimately did not arrange for any "side work" for Lough alone and the next group run, the third run, occurred on March 12, 2017.   Lough and Steever,[53] and Lough and UCE 1[54] exchanged texts setting up the logistics for this run.  Both UCE 1 and 2 completed a FBI 302 documenting the exchange at the

---

53   Government Exhibit 6.1.

54   Government Exhibit 6.1.1 and 6.1.2.

third run.[55]  A third UCE was also brought in for this exchange, "UCE 3."  Present for this third run were Steever, Lough, Baird, and a CHS.

During this third run, UCEs 1 and 3 met Steever, Lough, and Baird at a Dunkin Donuts in Harrisburg, Pennsylvania.   UCE 3 got into Lough's vehicle, and Steever got into the vehicle with UCE 1 for the trip to the Valley Mall in Hagerstown, Maryland, to meet UCE 2 for the staged methamphetamine transfer. Steever took the simulated methamphetamine from UCE 1 and provided it to UCE 2 in exchange for a bag of $8,000 cash, which Steever then provided to UCE 1.

UCE 1 gave Steever, Lough, and Baird their share of the funds and showed the group "a replica of an automatic Glock sear and indicated that the sears were being manufactured and available for purchase."[56]  UCE 1 explained in the 302:

> STEEVER then asked UCE-6395 how much money should be placed onto a prepaid credit card to which UCE explained it was their option because the prepaid credit card would be applied towards a future weapons deposit purchase. STEEVER acknowledged and STEEVER, LOUGH and BAIRD entered the Target store to purchase the credit card. Upon their exit from the Target store STEEVER, LOUGH and BAIRD each provided UCE-6395 with a sealed, activated prepaid Visa card.  STEEVER and BAIRD purchased $400.00 cards and LOUGH purchased a $200.00 card.        UCE-6395 secured all 3 cards.[57]

---

[55]  Government Exhibit 6.2 and 6.2.1.

[56]  Government Exhibit 6.2.1.

[57]  *Id.* at p. 2.

On March 20, 2017, UCE 1 and 2 met Steever, Baird, and Lough at the El Rodeo restaurant in Harrisburg.[58]  Agent Moore explained the reason for the meeting as "Mark was almost doing an interview to request information about previous illegal activity that the three Aryan Strikeforce [members] had been involved in previously as well as to essentially again, reiterate the fact that the work that he's going to be having them do is illegal and to find out if they were willing to do it."  On March 23 and 24, 2017, Steever and Lough engaged in a few text messages in anticipation of a visit from "Rus and Jon."[59]  On March 27, 2017, UCE 1 and Lough had a telephone call to prepare for a meeting.[60]

On March 30, 2017, Steever, Baird, and Lough met with two undercover employees (one was UCE 1, it is unclear which of the three undercover officers the third participant was).   During this meeting, UCE 1 explained that "whatever it takes, I just want you to know, what you're getting 'em dirty for. I mean, like if we're doing a 20-yard pour, I want you to know it's a 20 yard pour."[61]

UCE 1 again provided the participants with an 'out,' stating "no disrespect, if you're not into it, you're not into it. That's the only reason."[62]  Lough once again

---

[58]   Defendant's Exhibit 213.6.

[59]   Government Exhibit 6.3.

[60]   Government Exhibit 6.4.

[61]   Government Exhibit 7.2.   The Government did not elicit testimony during the hearing to explain what a "20 yard pour" refers to.  One may infer that UCE 1 was referring to the weight of drugs being transported during the next run.  However, this testimony was not elicited, so I will decline to make that inference.

[62]   *Id.*

offered himself as available for side work saying to UCE 1 "I don't know if you ever having any product, you need uh slung, I can definitely get rid of it where I'm at."[63] In addition, Lough, Baird, Steever, UCE 1, and the unidentified UCE engaged in the following conversation regarding firearms[64]:

Lough: What do you mean clean? They're not hot?

UCE: No they're not coming back to you, they're not coming back to anybody

Lough: So just, wow, ok

UCE: But

Lough: Ok, I'm not, I thought they were all uh hot, that's what I was assuming

UCE: Well

Baird: I can get you a dirty gun,

Lough: That's what I'm used to is all dirty, Arizona you can have dirty guns

Baird: You want like something small and compact?

Lough: Yeah, definitely

Baird: Thinking maybe, a glock 23 it's a 40 caliber

UCE: Yep yep, I know the 23

Lough: 380?

UCE 1: Remember that 380 walther, well you saw it,

---

[63]   *Id.* at p. 7.

[64]   *Id.* at 7-8.

Baird: And that's easier to

UCE 1: Yeah,

Lough: 380 is actually my favorite

Baird: I kinda got stuck on the Glock thing

Lough: 380 or a 45

Steever: Something we can carry on us pretty much.

Lough: Ummhmm

On April 6, 2017, Lough texted Steever asking "Any word on work?"[65] Steever told Lough the job would be the following day and to meet at his home. Lough replied "Alright I just got off the phone with Boots I will literally barely make it there but him and Jodi are going to scrounge up enough for me to get a couple gallons and make it the rest of the way to your house."[66]

The fourth and final run then took place on April 7, 2017. UCE 2 and UCE 3 both filled out FBI 302s; UCE 1 was not involved in this run. The prior day, UCE 2 called Steever and advised that they would be working tomorrow and later texted the meeting location.[67] Just after midnight on April 7th, Steever called UCE

---

[65] Government Exhibit 8.3.

[66] *Id.*

[67] Government Exhibit 8.4.

2 to let him know that he and Baird had been "jumped."[68]  But Steever ultimately advised UCE 2 that he and Baird would still be able to participate in the run.

Lough drove his vehicle to meet UCE 2 in a parking lot in Harrisburg. Steever exited Lough's vehicle and UCE 2 showed Steever a box that "contained four sear clips and fifty AR-15 lower receivers and [a] duffel bag containin[ing] 16 pounds of simulated methamphetamine."[69]

At the hearing, Agent Moore explained that "Glock sear inserts [] essentially would be used to convert a Glock handgun into a fully automatic gun;" and "AR lower receivers is essentially the housing for the trigger mechanism for the AR. It's also considered to be the actual firearm and each AR lower is serialized."  UCE 2 then got into Lough's vehicle with Steever and recorded the following in the 302:

> UCE [2] entered LOUGH's vehicle and provided LOUGH and STEEVER each with $1200 in U.S. currency.  UCE [2] requested each of them count the money.  UCE [2] explained there was more money than last time because, in addition to the meth, they had also transported the guns and the sear clips.  UCE [2] told them to contact BAIRD and have him come to meet them.  When BAIRD arrived, UCE [2] provided him with $1200 in U.S. currency.
>
> STEEVER asked if they were going [to] get gift cards with this money.  UCE [2] said yes.  STEEVER said BAIRD could not get a gift card at this time as he was going to use the money for restitution.  UCE 2 responded that was fine.[70]

---

[68]  The New Oxford American Dictionary defines "jumped" as "attack someone suddenly and unexpectedly."

[69]  Government Exhibit 8.4.

[70]  *Id.*

The group drove to a Target store in Hagerstown, Maryland. Lough drove one vehicle with Steever and UCE 2 with him; Baird drove alone. During the drive, Steever told UCE 2 that Steever and Lough had bought gift cards and gave them to UCE 2 with the intent he would provide them to UCE 3 as payment for a firearm.

One of the UCEs and Lough engaged in the following conversation:[71]

Lough: Strangely enough it comes at the perfect fucking time when I'm like at the worst off, I'm like fuckin stressing and then oh I get the call, oh fuck yeah!

UCE: I told you more jobs coming up man. Like I said, something a little bigger. It's gonna be a little different if it, if it looks like I think it's gonna look. It's gonna be a little different than this but I think you guys, you guys can handle it, it'll just be whether you want to do it or not.

Lough: It's not really about even wanting or not wanting to do it, it comes down to need, need to do it, you know, you got to do what you got to do to survive anymore

UCE: Yeah but

Lough: You can't really be picky and choosy, you just got to bite the bullet and do what you got to do.

UCE: 3 Yeah but I'd never force anybody to do anything they didn't, you know what I mean? It's, it's

Lough: Oh no, I understand that

---

[71]   Government Exhibit 8.5.

En route, Steever also described two recent altercations involving Baird. First, Steever discussed a fight Baird and Steever had gotten in with two black males and described how Baird used brass knuckles during that fight. Steever then related a second incident involving Baird that caused alarm to law enforcement. Steever and Baird both told UCE 3 about an incident in which Baird attempted to shoot another man.[72] Steever told UCE 3 "Henry almost fucking put a bullet in someone last night too."[73] Steever continued,

> UI fucking and he said we're a bunch of punks and Henry was like "oh we're a bunch of punks?" and he was like Henry put him down, he was like and put his .357 to his head, he was like "we're punks?" and Henry clicked back, he was like "you ready to die?" And the kid was like "I'm not afraid to die." UI Henry pulled the trigger and the kid fucking hit his arm and he put a fucking round through his fucking floor.[74]

Baird corroborated Steever's version of events, explaining to UCE 3 "Then I had a fucking UI, somebody at my house the other night. Last night he disrespected our club. UI fucking floor. Put it right on his forehead, said I'll blow your fucking head off. Before I pulled the trigger I cocked it, he fucking blocked it, through the fucking floor hit the goddamn motherfucking water pipe."[75] Baird also confirmed that he had assaulted someone with brass knuckles, saying to UCE 3 "Motherfucking nigger came up, 'what the fucks on your jacket' I blasted him with

---

[72]  Government Exhibit 8.5.

[73]  *Id.*

[74]  *Id.*

[75]  *Id.*

a brass knuckle, hit him like 6 to 7 times in the face. This other guy struck me, knocked my UI off, Josh UI"[76]

At the hearing, Agent Moore explained the incidents as follows:

It was within a week and the reason that that occurred was the rise in danger that was sort of perceived with the individuals from the Bureau's standpoint, we had gotten information from Henry Baird through the undercover, who had essentially talked about a story that Henry Baird had told him that the -- essentially he had a new recruit with Joshua Steever and Henry Baird were at his apartment in Allentown. They were there with a new recruit. There had been a discussion with this new recruit which this new recruit had insulted the Aryan Strikeforce. The story was that Henry Baird had tried to execute this individual by trying to shoot him in the head with his handgun. However, at the last minute his hand was moved off and he missed.

Agent Moore testified that the escalation in violence was the catalyst for law enforcement to decide that the timing was now right to make arrests. On April 11, 2017, the criminal complaints against these Defendants were filed.

## II. DISCUSSION: Lough and Robards' Motion to Dismiss the Indictment for Outrageous Government Conduct

### A. The defense of outrageous government conduct.

When a court disfavors a legal theory or argument, the intensity of the antipathy can be found in a written opinion flowered with quotable language. Purple prose abounds in appellate court opinions when a defense to a criminal charge is based on dicta.

---

[76] *Id.*

Here, Defendants argue that the indictment should be dismissed for 'outrageous government conduct.' In the forty-five years since United States Supreme Court dicta created this derivative of entrapment, the outrageous government conduct defense has succeeded in this circuit only once. The Defendants in this matter face significant factual and legal hurdles.

The defense of outrageous government conduct is an offshoot of the entrapment defense with its roots in the due process clause of the United States Constitution. "Entrapment and its related due process defense are based on the notion that it 'serves no justifying social objective' for the Government to 'creat[e] new crime for the sake of bringing charges against a person [it] had persuaded to participate in wrongdoing.'"[77]

In a case addressing neither defense, but simply the due process clause itself, Justice Felix Frankfurter, writing for the United States Supreme Court cautioned that the clause "is not to be turned into a destructive dogma against the States in the administration of their systems of criminal justice."[78] Justice Frankfurter continued, however, stating that "regard for the requirements of the Due Process Clause 'inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings (resulting in a conviction) to ascertain whether

---

[77] *United States v. Lakhani*, 480 F.3d 171, 177 (3d Cir. 2007) *citing United States v. West*, 511 F.2d 1083, 1085 (3d Cir.1975).

[78] *Rochin v. California*, 342 U.S. 165, 168 (1952).

they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses.'"[79]

Almost twenty years after Justice Frankfurter's cogitations, the defense of outrageous government conduct was created as protection for those defendants who cannot avail themselves of the defense of entrapment yet, similarly, claim conscious shocking behavior on the part of law enforcement. "Entrapment occurs only when the criminal conduct was 'the product of the creative activity' of law-enforcement officials."[80] "To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal."[81] Outrageous government conduct is the defense for the unsuspecting criminal.

This defense grew out of the seedlings planted by then Justice William H. Rehnquist, who, in *United States v. Russell*, postulated "While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, *cf. Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), the instant case is distinctly not of

---

[79] *Id.*

[80] *Sherman v. United States*, 356 U.S. 369, 372 (1958).

[81] *Id.*

that breed."[82]   Justice Rehnquist later reiterated that "the limitations of the Due Process Clause of the Fifth Amendment come into play only when the Government activity in question violates some protected right of the Defendant."[83]

In 1978, the United States Court of Appeals for the Third Circuit composed the only opinion to date in this Circuit that reversed a conviction for government conduct so outrageous that it was constitutionally violative.  The arguments in today's motion are rooted in this forty-year old precedential anomaly.

This singular case is *United States v. Twigg*.[84]   There were four players in the Twigg conspiracy: co-defendants Henry Neville and William Twigg (Twigg for his part was involved in the conspiracy for merely seven days); a confidential informant for the Government, Robert Kubica; and the Drug Enforcement Administration, "hereinafter DEA."  The Government set up a fake laboratory to make the drug speed, which was in operation for one week from the time the Defendants were induced to participate to the time they were arrested for that participation.

The Third Circuit was concerned with the amount of government control over this operation - both by the DEA and its non-employee informant, Kubica. The court's recitation of the facts is as follows,

---

[82]   411 U.S. 423, 431–32 (1973).

[83]   *Hampton v. United States*, 425 U.S. 484, 490–91 (1976).

[84]   588 F.2d 373 (1978) (Rosenn, J.).

At the behest of the Drug Enforcement Agency, Kubica, a convicted felon striving to reduce the severity of his sentence, communicated with Neville and suggested the establishment of a speed[85] laboratory. The Government gratuitously supplied about 20 percent of the glassware and the indispensable ingredient, phenyl-2-propanone. It is unclear whether the parties had the means or the money to obtain the chemical on their own. The DEA made arrangements with chemical supply houses to facilitate the purchase of the rest of the materials. Kubica, operating under the business name "Chem Kleen" supplied by the DEA, actually purchased all of the supplies with the exception of a separatory funnel. (The funnel was secured by Twigg at the direction of Kubica who was engaged in operating the laboratory.) When problems were encountered in locating an adequate production site, the Government found the solution by providing an isolated farmhouse well-suited for the location of an illegally operated laboratory. Again, there was no cost to the defendants. At all times during the production process, Kubica was completely in charge and furnished all of the laboratory expertise. Neither defendant had the know-how with which to actually manufacture methamphetamine. The assistance they provided was minimal and then at the specific direction of Kubica.[86]

Because this is the sole case to have reversed a conviction based on

outrageous government conduct, I cite to the basis for its holdings at length here:

> The contention that defendants raise which we find persuasive is that the nature and extent of police involvement in this crime was so overreaching as to bar prosecution of the defendants as a matter of due process of law. Although no Supreme Court decision has reversed a conviction on this basis, the police conduct in this case went far beyond the behavior found permissible in previous cases.

*****

> These instances of police involvement must be evaluated against the following backdrop. The only evidence that Neville was predisposed to commit the crime was his receptivity to Kubica's proposal to engage in the venture and the testimony of Kubica that he had worked with

---

[85] An illegal drug.

[86] *Twigg,* 588 F.2d at 380–81.

Neville in a similar laboratory four years earlier. Unlike other cases rejecting this defense, the police investigation here was not concerned with an existing laboratory, *United States v. Russell, supra*; the illicit plan did not originate with the criminal defendants, *United States v. Leja, supra; United States v. Smith, supra*; and neither of the defendants were chemists an indispensable requisite to this criminal enterprise.

*****

Twigg did not become involved in this criminal enterprise until March 1, 1977 the day the laboratory went into operation. His reason for becoming involved was to repay a debt owed to Neville. Neville introduced Twigg to Kubica, and then Twigg and Kubica went shopping for additional supplies, which Kubica purchased. There is no evidence to suggest that Twigg was aware of the ultimate purpose of these errands until informed by Kubica after returning to the farmhouse. All actions taken by Twigg from that time until his arrest were at the specific direction of Kubica, the government agent. Twigg contributed nothing in terms of expertise, money, supplies, or ideas. It also appears that Twigg would not even have shared in the proceeds from the sale of the drug. In light of these facts, we hold that Twigg's conviction is also tainted by the conduct of the DEA agents and that fundamental fairness requires its reversal.[87]

---

[87] *Id.* at 377-82, *Cf. United States v. Tucker,* 28 F.3d 1420, 1423-27 (6th Cir. 1994) ("Since this dicta was uttered, *Russell* has been cited more than two hundred times as authority for a defense based solely on an objective assessment of the government's conduct. Thus, the Court's dicta in Russell spawned the very defense which a majority of Justices in that case sought to foreclose…. Based on the lack of binding precedent from either the Supreme Court or the Sixth Circuit, we are of the view that this panel is not required to recognize the "due process" defense. Moreover, there are three strong reasons for concluding that such a defense simply does not exist: (1) government conduct which induces a defendant to commit a crime, even if labelled "outrageous," does not violate that defendant's constitutional right of due process; (2) the district court lacked authority to dismiss the indictment for governmental misconduct where no violation of an independent constitutional right has been shown; and (3) continued recognition of this "defense" stands as an invitation to violate the constitutional separation of powers, intruding not only on the province of the Executive Branch but the Legislative Branch as well.")

The Third Circuit panel was divided, however, with Judge Arlin M. Adams

dissenting. Judge Adams' dissent foreshadowed the view of the majority of

modern appellate courts. He stated, pertinently:

> Like the majority, I view the government involvement here with a certain degree of concern. Indeed, I do not personally approve of the level of official involvement in this particular case. Unlike the majority, however, I do not believe that the government's activity can be classified as unconstitutional, at least not under the most recent decisions of the Supreme Court. As I read those cases, the possibility of due process review of the activities of our law enforcement agencies was reserved only for truly "outrageous" cases. Due process analysis was not intended simply to reestablish the objective approach to entrapment under a new name. Because I do not believe this situation presents the intolerable set of facts necessary to warrant resort to the due process clause, I must dissent.[88]

The Third Circuit has since distanced itself from the *Twigg* holding. Chief

Judge Edward R. Becker commenced an opinion in the matter of *United States v.*

*Nolan-Cooper* which denied a defendant the use of this defense by stating:

> In *United States v. Twigg*, 588 F.2d 373 (3d Cir.1978), we sustained a defendant's claim that the government's investigatory misconduct was so egregious that the due process clause demanded dismissal of the indictment against him. This holding was predicated on a pair of Supreme Court cases that appeared to recognize such a defense, *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), and *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976). In contrast to some other circuits which have never recognized the defense or no longer do so, *see United States v. Tucker*, 28 F.3d 1420, 1426-27 (6th Cir.1994); *United States v. Boyd*, 55 F.3d 239, 241 (7th Cir.1995), it has remained viable in this circuit, though in the twenty years since *Twigg* we have not found another set of facts that satisfy its rigorous requirements. *See United States v. Voigt*, 89 F.3d

---

[88] *Id.* at 383 (Adams, J. dissent).

1050 (3d Cir.), cert. denied 519 U.S. 1047, 117 S.Ct. 623, 136 L.Ed.2d 546 (1996).[89]

In *Nolan-Cooper*, Chief Judge Becker examined the Supreme Court's erosion of the doctrine to explain the Third Circuit movement away from the holding in *Twigg*. "The Court revisited this [*Russell*] dictum in *Hampton v. United States* ...although the Court rejected [*Hampton's*] claim, the legal viability of the defense was maintained by a narrow margin."[90] "Yet, shortly thereafter, signs appeared that that narrow margin was beginning to shift."[91] Chief Judge Becker continued, "Some have read Justice [Lewis F.] Powell's adoption of the *Hampton* plurality's language in *Payner*[92] as a sign that a majority of the Court no longer believed in the viability of the defense."[93]

Chief Judge Becker went on to observe:

> While it appears that the viability of the doctrine is hanging by a thread, see, e.g., *Tucker*, 28 F.3d at 1426-27, and Boyd, 55 F.3d at 241, we have, since Payner, concluded that "we have no reason to doubt that the Court continues to recognize a due process claim premised upon outrageous law enforcement investigative techniques." *Voigt*, 89 F.3d at 1064. Many of the other circuits have done the same. *See United States v. Mosley*, 965 F.2d 906, 909 (10th Cir.1992) (collecting cases recognizing the viability of the defense from the D.C., First, Fifth, Eighth, Ninth, Tenth, and Eleventh Circuits).

---

[89]  *United States v. Nolan-Cooper*, 155 F.3d 221, 224 (3d Cir. 1998).

[90]  *Id.* at 229.

[91]  *Id.*

[92]  *United States v. Payner*, 447 U.S. 727 (1980).

[93]  *Nolan-Cooper* at 230.

While continuing to recognize, in theory, the outrageousness defense, we have nonetheless observed that, because of the extraordinary nature of the doctrine, the judiciary has been "extremely hesitant" to uphold claims that law enforcement conduct violates the Due Process clause.[94]

"The banner of outrageous misconduct is often raised but seldom saluted."[95]

"Even though one respected jurist contends that the doctrine belongs in the dustbin of history, case after case confirms its continued existence."[96]   Be that as it may, the doctrine is moribund; in practice, courts have rejected its application with almost monotonous regularity."[97] "The historical record makes it clear, therefore, that the outrageous misconduct defense is almost never successful."[98]

"Nevertheless, *Twigg* remains the touchstone for analysis within this circuit, as it has yet to be overruled despite the obvious reluctance to apply it."[99]

---

[94] *Id.* The Third Circuit is not alone distancing itself from *Twigg*. The Sixth Circuit has stated "We note, however, that this holding has been disavowed by the Third Circuit on the ground that the *Twigg* court improperly relied on *United States v. West*, 511 F.2d 1083 (3d Cir.1975), which had been limited by *Hampton* and other, more recent, Third Circuit opinions. *See United States v. Beverly*, 723 F.2d 11, 12 (3d Cir.1983) (*citing United States v. Jannotti*, 673 F.2d 578, 610 n. 17 (3d Cir.1982) (*en banc*), cert. denied, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982)). Accordingly, we do not consider *Twigg* persuasive on the issue of whether or not a "due process" defense should be recognized."  *United States v. Tucker*, 28 F.3d 1420, 1425 (6th Cir. 1994).

[95] *United States v. Santana*, 6 F.3d 1, 4 (1st Cir. 1993).

[96] *Id.* (internal citation omitted).

[97] *Id.*

[98] *Id.*

[99] *United States v. McLean*, 85 F. Supp. 3d 825, 832 (E.D. Pa. 2015) (McHugh, J.).

## B. Application of the Elements of Outrageous Government Conduct

As the *Twigg* majority recognized, "admittedly, it is difficult to know what standards to apply in order to conclude that a given course of action is 'outrageous.'"[100]  Additionally, the Third Circuit has further expounded that "delineation of the conduct circumscribed by the due process defense is, at best, elusive."[101]  Even relatively recently, the Third Circuit stated "the showing required to establish a due process violation, though often recited, is by no means pellucid."[102]

Although "other courts have experienced considerable difficulty in translating 'outrageous misconduct' into a defined set of behavioral norms,"[103] the Honorable Gerald A. McHugh of the Eastern District of Pennsylvania has adroitly pieced together the puzzle in the labyrinth of case law and distilled a four-part test to determine when the defense is available.  "1) Infiltration of an Already–Existing Criminal Enterprise;[104] 2) Fleeting Nature or Elusiveness of the Crime;[105] 3) Government Instigation/Origination;[106] and 4) Control of Operations."[107]

---

[100] *Twigg*, at 385.

[101] *United States v. Jannotti*, 673 F.2d 578, 606 (3d Cir. 1982).

[102] *United States v. Voigt*, 89 F.3d 1050, 1064–65 (3d Cir. 1996).

[103] *Nolan-Cooper* at 230.

[104] *McLean* at 833.

[105] *Id.* at 834.

[106] *Id.*

[107] *Id.* at 835.

### 1. Infiltration of an Already–Existing Criminal Enterprise

"The first factor *Twigg* addressed was the temporal relationship between the initiation of the crime for which the defendant is charged and the initiation of the government's involvement."[108] "In *Russell*, the case in which the Supreme Court suggested, but declined to hold, that outrageous conduct could invalidate a conviction, the defendant was an active participant in an illegal drug manufacturing enterprise which began before the government agent appeared on the scene."[109] "*Twigg* was differentiated by the fact that Neville and Twigg, the defendants, were not involved in any ongoing criminal enterprise at the time that the government first approached them."[110] "The inception of the enterprise also appeared as a major factor in *Nolan–Cooper*."[111] "There, the court found that *Twigg* was of no help to the defendant because the undercover agent became involved in the operation after the criminal scheme had already been created."[112]

Here, the Government infiltrated a pre-existing organization that had both legal and illegal objectives. The ASF was a white supremacist organization, which is certainly legal. However, the FBI also had intelligence of at least some criminal activity within the group. The investigation was initiated based on two separate

---

[108] *Id.* at 833.

[109] *Id.* at 833-4 (internal citations and quotations omitted).

[110] *Id.* at 834.

[111] *Id.*

[112] *Id.* (internal citations and quotations omitted).

pieces of information the FBI received: first, convicted felons in possession of firearms, and second, a potential IED/bomb plot. The investigations overlapped because they both involved the president of the ASF, Ronald Pulcher.

After Pulcher's arrest, the investigation shifted focus to Steever and his interest in acquiring illegal firearms. The ASF had members who were felons barred from possessing firearms. Initially, the investigation centered around Steever and his willingness to act as security for drug runs to make money to buy guns. Then, as Steever unwittingly brought the other co-defendants into the mix, the investigation expanded to include Lough and Robards (and the others). As the investigation progressed, the undercover employees learned of violence perpetrated by ASF members, including fights using brass knuckles and Baird's point-blank style attempted execution of another person.

Because the ASF was a pre-existing enterprise with some criminal intent, this factor weighs in favor of the Government.

## 2.    Fleeting Nature or Elusiveness of the Crime[113]

"Next, Twigg differentiated the drug manufacturing involved in the case from the drug sale before the Supreme Court in Hampton, noting that the sale of an illegal drug is a much more fleeting and elusive crime to detect than the operation of an illicit drug laboratory."[114]  "In essence, the court looked to the difficulty of

---

[113]  *Id.*

[114]  *Id.* (internal citations and quotations omitted).

the respective crimes to detect."[115] "It concluded that a drug sale is an extremely fleeting transaction, and in such a situation the practicalities of combating drug distribution may require more extreme methods of investigation."[116] "In contrast, ongoing criminal operations, like the stationary drug laboratory in *Twigg*, are not as fleeting or elusive as the drug sales seen in *Hampton*."[117] "In support of this line of analysis, the Third Circuit relied on Justice Powell's reasoning that in evaluating whether government conduct is outrageous, the court must consider the nature of the crime and the tools available to law enforcement agencies to combat it."[118] "Similarly, the court in *Lakhani* noted that crimes which are difficult to uncover and in which both parties have an interest in concealment should permit the government greater latitude in their investigative techniques."[119]

There are three crimes at issue in the case at bar. The drug crimes are fleeting in nature; the firearms possession/acquisition somewhat less so; and the alleged IED/bomb plot is not fleeting as it would have a definitive end date. This factor is not clear-cut in its analysis because the investigation changed focus as it progressed.

---

[115] *Id.*

[116] *Id.* (internal citations and quotations omitted).

[117] *Id.*

[118] *Id.* (internal citations and quotations omitted).

[119] *Id.* (internal citation omitted).

On cross-examination, Agent Moore agreed with defense counsel that an investigation about acquiring illegal guns was transformed into a drug case. On re-direct, the prosecutor asked him "Now, for instance the scenarios involving the transfer of methamphetamine, was the operation set up there, the transfer of methamphetamine intended to lend some element of plausibility to the scenario?" Agent Moore replied, "Absolutely. Plausibility. I think with groups such as white supremacist groups, methamphetamine has been a drug that's been acceptable, just the history of methamphetamine itself, having been created by Adolf Hitler and the Germans to use with soldiers during World War II."

Defendants elicited testimony and set forth evidence that the FBI knew that at least Pulcher and Steever had possessed illegal firearms and could have immediately arrested them for that crime, the initial subject of the investigation. Because the initial thrust of the investigation, firearms acquisition and possession by prohibited persons, was not a fleeting crime, I find this factor to favor the Defendants.

### 3. Government Instigation/Origination[120]

"Perhaps the most important factor of the outrageousness inquiry extrapolated from *Twigg* is whether the crime was "conceived and contrived by government agents."[121] "The *Twigg* court spent a great deal of time on this

---

[120] *Id.*

[121] *Id.*

particular element."[122] "As far as the court could tell, the original target approached, Neville, had been 'lawfully and peacefully minding his own affairs' at the time he was approached by the government."[123] "The agents had deceptively implanted the criminal design in Neville's mind."[124] "They set him up, encouraged him, provided the essential supplies and technical expertise, and when he and Kubica encountered difficulties in consummating the crime, they assisted in finding solutions."[125] "This conduct had generated new crimes by Neville merely for the sake of pressing charges against him."[126] "In short, the conviction of the specific defendant must have been the goal of the government's conduct."[127]

In this matter, neither Lough's nor Robards' convictions were the 'goal' of the Government's conduct. Neither man was in the FBI's field of view prior to Steever's unwitting introduction of them into the conspiracy.

Steever references Lough for the first time during a November 16, 2016 phone call with UCE 1.[128] After the disagreement between Davis and McFall, Steever tells UCE 1 that those players will not be present at the November 19, 2016 Cracker Barrel meeting. Instead "two guys from Virginia are going to be

---

[122] *Id.*

[123] *Id.* at 834-5 *citing Twigg, supra.*

[124] *Id.* at 835.

[125] *Id.*

[126] *Id.* (internal citations and quotations omitted).

[127] *Id.*

[128] Government Exhibit 1.15.

there."  One of those was Steever's "bro Rocko;"  Rocko is the nickname for

Lough.

Steever also brought Robards into the conspiracy.  On a January 4, 2017

telephone call with UCE 1, Steever tells UCE 1 "we can get him involved if you

want…he did shit with me before."

It is evident that the Government did not set up the 'runs' to indict either

Lough or Robards; instead Steever introduced both Lough and Robards to the

UCEs.  Moreover, the Defendants were repeatedly advised they could back out of

the crimes proposed. During the November 19, 2016 Cracker Barrel meeting, UCE

1 told Lough and the others that "there were no issues if the ASF members did not

want to assist and that because of the possibility of jail time they all needed to

make sure it was something they wanted to partake in."  During the March 20,

2017 El Rodeo meeting, UCE 2 reiterated to Lough and the others that the work he

was asking them to do was illegal and to ensure they were willingly engaging in it.

Ten-days later during a March 30, 2017 meeting, UCE 1 advised that the work was

illegal and provided an out for the participants.

Although the Defendants argue that this situation is analogous to *Twigg*, in

that the Government created the crime and implanted it in the Defendants minds,

the Defendants all had ample opportunity to back out of further criminal activity

had they changed their minds after the first meth run.   The Defendants' situation is

more analogous to the scenario portrayed in *Nolan-Cooper*, in that the Defendants

participation in "criminal conduct in this case was pervasive and entirely voluntary."[129]

Not only were the Defendants repeatedly offered the opportunity to withdraw from the conspiracy, but what is particularly damning to Lough, is that Lough begins proactively reaching out to UCE 1 to ask for more work or side work he can do alone. On February 11, 2017, for example, Lough texted Steever asking Steever to find out from UCE 1 when the next run would be. Then on February 12, 2017, Lough asks UCE 1 on a telephone call "Do you have anything uh, where you don't need the others, might just need me?" Lough continues to explain to UCE 1 that he wants side work because he needs the money. Lough texted UCE 1 on February 20, 2017 asking again if there is "any word on some side work yet? Money's gotten extremely tight for me." During a March 30, 2017 meeting, Lough said to a UCE "I don't know if you ever having any product, you need uh slung, I can definitely get rid of it where I'm at." On April 6, 2017, Lough texted Steever "any word on work?" Then, during the ride for the final run on April 7, 2017, Lough expressed how excited he was to get the call that it was time to do 'work.'

Additionally, I find it to be significant that none of the Defendants were charged with their participation in the first run that occurred on December 4, 2016. Unlike *McLean*, where the defendant was immediately arrested for his

---

[129]     *Nolan-Cooper* at 226.

participation in the sting, the Defendants here all had the opportunity to back out of the criminal enterprise following the first run.  Had they done so, they would have the good fortune of not facing a federal indictment.  Moreover, none of the Defendants purchased the gift cards that form the basis for the money laundering charges with proceeds from the first run.  Again, it shows that the Defendants were comfortable saying 'no' to criminal activity they did not willingly and voluntarily desire to participate in, by on at least one occasion, refusing to buy the gift cards as recommended by the undercover agents.

Because the Government did not target Lough and Robards, because they were offered the opportunity to withdraw from the conspiracy, because Lough was not charged with his participation in the first 'run,' and because Lough proactively requested additional criminal 'work,' I find that this factor weighs strongly in favor of the Government.

### 4.    Control of Operations[130]

"Perhaps as important as governmental instigation is the determination of who was in control of the criminal enterprise."[131]   "The control factor focuses on the role of the defendant in planning the crime and bringing it to fruition, as well as whether the defendant had the means to commit the crime without the government

---

[130] *Id.*

[131] *Id.*

involvement."[132]  "'Means' includes both the knowledge and the physical

materials."[133]  "*Twigg* stated that it was unclear whether the parties had the means

or the money to obtain the requisite chemical to manufacture the drug had the

government not supplied it."[134] "The DEA had supplied a great deal of glassware

and the indispensable ingredient."[135]  "Additionally, the DEA had made all

arrangements with chemical supply companies, had created the business under

which the group purchased all of the supplies, and provided the property upon

which the drug laboratory was operated."[136]  "Not only did the government provide

the materials required to bring the crime to fruition, but Kubica, the informant,

provided all of the laboratory expertise."[137] "It was clear that neither defendant had

the required knowledge to actually manufacture any drugs, and that the crime

could only come to fruition with the expertise provided by an agent of the

government."[138] "In looking at the roles of the defendants in the operation, the

court noted that the informant had been completely in charge of the production

---

[132] *Id.*

[133] *Id.*

[134] *Id.* at 835-6 (internal citations and quotations omitted).

[135] *Id.* at 836.

[136] *Id.*

[137] *Id.*

[138] *Id.*

process, and any assistance the two defendants had provided had been minimal and at the specific direction of the informant."[139]

In the matter at hand, the Government exercised some control over the operation. The FBI decided when and where the methamphetamine runs would take place. The Government decided which illegal items to transport using the Defendants as 'security' for the run. The Government also decided the weight of the synthetic drugs. It is certainly concerning that the Government controlled the weight of the drugs brought on each run. The weight is a substantial weight that triggers mandatory minimum sentences here.

However, the ASF members themselves also took control of some of the decisions. Steever brought both Lough and Robards into the criminal plan. Neither CHS 4 nor the UCEs controlled the decision that Lough would be the driver for the runs. Prior to the first run, on November 21, 2016, Steever told UCE 1 that "we're gonna have fucking Rocko [Lough] drive because [Dykes is] having car problems." Additionally, in a phone call with UCE 1, Steever demonstrated that he was controlling whether or not the others bought gift cards. When asked by UCE 1 if they wanted to buy gift cards to purchase illegal firearms, Steever responded "next time I may have them do it."

---

[139] *Id.*

Here, the Government had control of some important factors, specifically the type of crime and the drug weight involved. However, the Government did not control who Steever brought in and who would drive the 'security' car. Because the control of the criminal activity was split between the Government and at least Steever, I find that this factor is neutral.

### 5.  Analysis Conclusion

In sum, the factors militate against dismissing this indictment. The Defendants have "the burden of proof on such a motion"[140] and they simply have not satisfied this high burden.

 "The fact that the Government, as here, is on all sides of a transaction—both buyer and seller—does not a due process violation make."[141]  "The defense…enunciated in those [Supreme Court] opinions was not intended to give the federal judiciary a 'chancellor's foot' veto over law enforcement practices of which it did not approve."[142]  "The execution of the federal laws under our Constitution is confided primarily to the Executive Branch of the Government, subject to applicable constitutional and statutory limitations and to judicially fashioned rules to enforce those limitations"[143]

---

[140]  *United States v. Pincombe*, No. 2:14-CR-00178-JAD-GWF, 2015 WL 8480079, at *4 (D. Nev. Nov. 3, 2015), report and recommendation adopted, No. 2:14-CR-00178-JAD-GWF, 2015 WL 8328256 (D. Nev. Dec. 7, 2015).

[141]  *United States v. Lakhani*, 480 F.3d 171, 182–83 (3d Cir. 2007) (internal citation omitted).

[142]  *Russell*, 411 U.S. at 435.

[143]  *Id.*

The Court's role is to ensure that law enforcement did not violate the Constitution, which I hold today they did not. The Court's role is also to ensure that if these Defendants committed the elements of the offenses charged in the manner Congress intended so as to warrant criminal punishment, that they were not induced to commit the offenses by the Government. The motion to dismiss the indictment for outrageous government conduct is denied.

## III. DISCUSSION: Lough and Robards' Supplemental Motion to Dismiss the Indictment for Destruction of Evidence

Defendants' supplemental motion to dismiss is couched in the Government's assertion that the February 19, 2016 meeting at the Cracker Barrel restaurant near Staunton, Virginia was not recorded "due to an equipment malfunction."[144] Thus, Defendants are moving to dismiss the indictment for this alleged "destruction" of the audio recording, asserting that the alleged destruction is outrageous and rises to the level of a due process violation.

The United States Supreme Court, in *Arizona v. Youngblood,* has "stressed the importance for constitutional purposes of good or bad faith on the part of the Government when the claim is based on loss of evidence attributable to the Government."[145] Chief Justice William H. Rehnquist, writing for the Supreme Court continued, "We think that requiring a defendant to show bad faith on the part

---

[144] ECF No. 190.

[145] *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988).

of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant."[146] "We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."[147] In *California v. Trombetta,* the Supreme Court expounded, "whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed."[148]

The Third Circuit distilled from these two cases the elements necessary for a defendant to establish a due process violation, explaining that "under *Youngblood* and *Trombetta,* a defendant must show that the government '(1) acted in bad faith when it destroyed the evidence, which (2) possessed an apparent exculpatory value and, which (3) is to some extent irreplaceable.'"[149]

---

[146]  *Id.* at 58.

[147]  *Id.*

[148]  *California v. Trombetta*, 467 U.S. 479, 486 (1984) (Marshall, J.).

[149]  *United States v. Jackman*, 72 F. App'x 862, 866 (3d Cir. 2003), *quoting United States v. Femia*, 9 F.3d 990, 993-94 (1st Cir.1993).

**A.    The testimony elicited at the hearing**

There was very little by way of testimony at the hearing as to this issue, and no argument from counsel on this motion. The following exchange took place during the direct examination of Agent Moore:

Q. Now, in connection with this Cracker Barrel meeting I believe Staunton, Virginia, was an undercover employee present during these this meeting?

A. Yes.

Q: And was an effort undertaken to record this meeting using a body recording of some kind by the undercover?

A. Yes. The undercover, at that point the body recorder had intended in recording it. Unfortunately, you know due to technical means, something happened. The recorder actually didn't go on. Unfortunately we were unable to actually get a recording of it.

Q. So the recording device was not effectively activated in order to record. Is that correct?

A. Correct.

Q. Did undercover employee however, prepare a report outlining the nature of the discussions and who was present, et cetera?

A. Yes.

Q. And was that reduced to the form of what's called an FBI 302 report?

A. That's correct.

## B. Did the Government act in bad faith?

"In missing evidence cases, it is the presence or absence of bad faith that will be dispositive."[150] "Unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."[151] "In requiring a showing of bad faith, the Supreme Court sought to limit due process violations 'to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant.'"[152]

"A defendant has the burden 'to show the prosecution's bad faith in ordering or permitting' the destruction of evidence.'"[153] "A defendant may establish bad faith by showing that the government knew the exculpatory value of evidence at the time the evidence was lost or destroyed."[154]

Agent Moore testified that the intent was for the undercover employee to record the meeting with a body wire, but that the meeting was not recorded due to unfortunate "technical means." Defense counsel did not elicit any more testimony

---

[150] *United States v. Seibart*, 148 F. Supp. 2d 559, 571 (E.D. Pa. 2001) (Brody, J.) *citing Youngblood*, 488 U.S. at 58.

[151] United States v. Kennedy, 720 F. App'x 104, 108 (3d Cir. 2017) (Scirica, J.) (unpublished), cert. denied, 138 S. Ct. 1601, 200 L. Ed. 2d 784 (2018) quoting Youngblood, 488 U.S. at 58.

[152] *Id.*

[153] *United States v. Robinson*, 855 F. Supp. 2d 419, 422 (E.D. Pa. 2012) *quoting United States v. Deaner*, 1 F.3d 192, 200 (3d Cir.1993).

[154] *Id. See also Yarris v. Cnty. of Del.,* 465 F.3d 129, 142 (3d Cir.2006).

as to this issue on cross examination.  Consequently, as Agent Moore was a credible witness, I have no basis on which to find as Defendants suggest that evidence was "destroyed."  I hold then that there was no bad faith on the part of law enforcement as there was apparently merely a technical malfunction in the recording equipment.

Because I do not find bad faith on the part of law enforcement, I need not turn to the final two elements, whether the recording would have had exculpatory value[155] or was irreplaceable.[156]

## C.    Conclusion

I find that there is no due process violation here, because there is simply no evidence that law enforcement acted in bad faith in failing to record the November 19, 2016 Cracker Barrel meeting.  The motion to dismiss the indictment for the alleged destruction of evidence will therefore be denied by separate order.

---

[155] However, for the sake of completeness, I will add that it is unlikely that the recording would have exculpated Lough, as the FBI-302 form that summarized this meeting indicated that Lough had requested a "piece," i.e. a firearm, for the 'run'. This indicates that Lough understood that he was involving himself in transporting something illegal, otherwise he would not have requested a "piece."  Additionally, Lough offered his vehicle and himself as the driver. Affirmatively offering driving assistance is more likely to inculpate, rather than exculpate.

[156] The meeting was memorialized nearly contemporaneous to its happening, by the undercover employee, who drafted an FBI-302 summarizing the meeting on November 21, 2016, two-days after the meeting occurred, a close substitute for the recording.

## IV.    DISCUSSION: Lough's Motion to Suppress Evidence

Lough is also moving to suppress the physical evidence obtained pursuant to a search warrant for 417 Maple Avenue, Waynesboro, Virginia.[157]  "The burden of proof is on the defendant who seeks to suppress evidence."[158]  If a defendant establishes a valid basis for his motion, the burden shifts to the Government to show that the search and seizure fit within an established exception to the warrant requirement.[159]

United States Magistrate Judge Joel Hoppe of the Western District of Virginia issued a search warrant based on an affidavit from Dino P. Cappuzzo (hereinafter "Cappuzzo").  Cappuzzo is a Deputy United States Marshal assigned as a Task Force Officer with the Federal Bureau of Investigation.[160]  Lough argues on this point as follows:

> Lough submits that the affidavit in support [of] the search warrants does not contain any information establishing probable cause to believe that the residence at 417 Maple Avenue, Waynesboro, VA contained controlled substances, items related to the trafficking of controlled substance or any other items connected with criminal activity.
>
> Lough further submits that the search warrant pursuant to which the search was conducted was issued in violation of the Fourth Amendment to the United States Constitution because the warrant fails to set forth sufficient facts to establish a nexus between criminal activity

---

[157]  ECF No. 232.

[158]  *United States v. Benoit*, 730 F.3d 280, 288 (3d Cir. 2013) (*quoting United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (internal quotation marks omitted)).

[159]  *See, e.g. United States v. Herrold,* 962 F.2d 1131, 1137 (3d Cir. 1992).

[160]  ECF No. 232-2 at 2.

independent of criminal activity created and orchestrated by the government, and the residence in question.

The affidavit does not provide any information to support a fair probability that controlled substances or any other items connected with criminal activity would be present at 417 Maple Avenue, Waynesboro, VA.[161]

The only reference to Lough's residence is at paragraph 22 of the affidavit. It states that law enforcement "observed [Lough] arriving at his residence at 10:02 on 12/4/16. … and entering his residence at 417 Maple Ave Waynesboro, Virginia, through the front door." This is a conclusory statement and fails to establish that 417 Maple Ave., Waynesboro, Virginia is Lough's residence. There is nothing to suggest that Lough actually lives at 417 Maple Ave., Waynesboro, Virginia.[162]

### A.    Lough's Legitimate Expectation of Privacy in 417 Maple Avenue, Waynesboro, VA, 22980.

Although the affiant asserts that Lough was a resident of 417 Maple Avenue, Waynesboro, Virginia, Lough argues in his brief supporting the motion that the affidavit fails to establish that as his residence.[163]  The Government argues that if Lough is contending that this is not his residence, then he does not have standing to move to suppress.  During the hearing, counsel conceded the Government's argument as to standing, stating "I mean I can say on the record that I concede Mr. Rocktashel's point with respect to the residence and standing to raise it with respect to the residence."

---

[161]  ECF No. 232 at ¶ 17-19.

[162]  ECF No. 233 at 8.

[163]  ECF No. 233 at 8.

Lough bears the burden of proving that he had a legitimate expectation of privacy in the search of 417 Maple Avenue, Waynesboro, Virginia. "The 'standing' inquiry, in the Fourth Amendment context, is shorthand for the determination of whether a litigant's Fourth Amendment rights have been implicated."[164] "To invoke the Fourth Amendment's exclusionary rule, a defendant must demonstrate that his own Fourth Amendment rights were violated by the challenged search or seizure."[165] "Because Fourth Amendment rights are 'personal,' the proponent of a motion to suppress 'bears the burden of proving not only that the search ... was illegal, but also that he had a legitimate expectation of privacy in' the place searched."[166] "Significantly, a defendant's Fourth Amendment rights are not violated by the introduction of evidence obtained in violation of a third party's rights."[167]

"An individual's expectation of privacy is legitimate if: (1) the individual demonstrated a subjective expectation of privacy in the subject of the search and (2) this expectation of privacy is objectively reasonable."[168] "The subjective prong requires a court to determine whether the defendant, 'by his conduct, has exhibited

---

[164] *United States v. Stearn*, 597 F.3d 540, 551 (3d Cir. 2010).

[165] *Id.*

[166] *Id. quoting Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980).

[167] *Id.*

[168] *United States v. Cortez-Dutrieville*, 743 F.3d 881, 884 (3d Cir. 2014) (Shwartz, J.) (internal citations omitted).

an actual expectation of privacy.'"[169] "The objective prong requires a court to determine whether the defendant's expectation of privacy is 'one that society is prepared to recognize as reasonable.'"[170]

Here, because defense counsel conceded that without an acknowledgement that Lough had a reasonable expectation of privacy in the 417 Maple Avenue, Waynesboro, Virginia residence, he may not have standing to challenge the probable cause for the search warrant, I find that the Defendant did have a reasonable expectation of privacy in this residence; as a result, I must continue to determine whether there was sufficient probable cause for the warrant to issue.

## B.    Probable Cause for the Search Warrant

Lough naturally argues that there was not probable cause for the search warrant to issue, and that therefore, the evidence obtained should be suppressed. At the hearing, defense counsel neither argued this motion nor presented any evidence, but instead chose to rest on her papers. The Government presented limited testimony from Agent Moore. However, I need not recite Agent Moore's testimony here, as the discussion rests on the state of the law and what the issuing magistrate judge knew at the time that the warrant was issued.

The Fourth Amendment to the United States Constitution states: "The right of the people to be secure in their persons, houses, papers, and effects, against

---

[169] *Id. quoting Bond v. United States,* 529 U.S. 334, 338 (2000).

[170] *Id.*

unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Determining whether there was probable cause for a search warrant to issue is "a deferential review"[171] encompassing "a 'practical, nontechnical conception.'"[172] "In dealing with probable cause, ... as the very name implies, we deal with probabilities. "[173] "These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."[174] "Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers."[175] "The evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement."[176]

"The role of a reviewing court is not to decide probable cause *de novo*, but to determine whether the magistrate had a substantial basis for concluding that

---

[171] *United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010) (Aldisert, J.).

[172] *Illinois v. Gates*, 462 U.S. 213, 231 (1983), *quoting Brinegar v. United States*, 338 U.S. 160 (1949).

[173] *Id.*

[174] *Id.*

[175] *United States v. Cortez*, 449 U.S. 411, 418 (1981).

[176] *Id.*

probable cause existed."[177]  A hindsight review of a decision of a neutral and detached magistrate judge is conducted through a totality of the circumstances.[178] "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him…there is a fair probability that contraband or evidence of a crime will be found in a particular place."[179] "The duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed."[180] This is a "flexible, easily applied standard."[181]

This Court is mindful that it must not merely "rubber stamp a magistrate's conclusions."[182]  Nevertheless, I must keep in mind the United States Supreme Court's direction that "doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants."[183] With that said, I turn to the agent's affidavit of probable cause.   It states, in relevant part:

10) I make this affidavit in support of a Search Warrant(s) for the following item(s); hereinafter referred to as "property to be searched:"

417 Maple Avenue, Waynesboro, VA. 22980

[177]  *Stearn* at 554 (internal citation and quotation omitted).

[178]  *See Gates*, *supra*.

[179]  *Gates*, at 238.

[180]  *Id.* (internal citation and quotation omitted).

[181]  *Id.*

[182]  *Stearn*, at 554.

[183]  *Gates*, 462 U.S. at 237 n. 10.

12) This affidavit seeks to establish probable cause to seize any cell phones and/or other electronic devices identified in the search and any evidence linking JUSTIN DANIEL LOUGH to the criminal organization the Aryan Strikeforce, such as patches, correspondence, papers, clothing, wall coverings, or items bearing the Aryan Strikeforce, or other white supremacist organization or group logo or name. In addition, this affidavit seeks to establish probable cause to seize any evidence related to the illegal trafficking of a schedule I controlled substance, namely methamphetamine, to include methamphetamine, packaging materials, scales, logbooks and ledgers, and U.S. currency.

13) JOSHUA STEEVER, a.k.a. "HATCHET," has been identified as the Founder of a group known as the ARYAN STRIKEFORCE ("ASF"), which in its mission statement (found on their website, www.aryanstrikeforce318.org) advises that the group is a "white nationalist organization" with the "goal to protect the honour of our women, children, and the future of our race and nation." ASF advocates violence as a necessary tool to achieve their political goals.*[1]

14) Based upon social media postings by JOSHUA STEEVER and his identified associates within the organization, the ASF also claims to be members of, or associates of, Combat 18.

15) Combat 18 is a Neo-Nazi organization associated with the White Supremacist "Blood and Honour" Organization started in the United Kingdom in the 1990s. Combat 18 is officially titled "the official armed wing of Blood and Honour." Combat 18 was associated with acts of terrorism and violence including arson attacks throughout the 1990s. It has since spread internationally with other groups and organizations using the Combat 18 badge. Combat 18 ascribes to the concept of "leaderless resistance" similar to lone wolves, or small cell structures employed by other terrorist organizations. Combat 18 takes its name from Adolph Hitler; with the initials A. and H. being the 1st and 8th letters of the alphabet.

16) HENRY BAIRD, has been identified as a "patched" member of the ASF through UCE reporting, and surveillance of BAIRD wearing the ASF patch on his jacket. "Patched" refers to the individual receiving official membership status as evidenced by an actual

patch sewn onto their jacket. Social media also reported that BAIRD was recently promoted to be the President of the ASF.

17) JUSTIN LOUGH, a.k.a. "ROCKO" has been identified as a patched member of the ASF through UCE reporting, as well as social media postings and surveillance of LOUGH wearing the ASF patch on a jacket. LOUGH also displays an ASF bumper sticker on his tan Ford Escape, Virginia license plate "H8CH3VY."

20) Based upon the affiant's knowledge and expertise in investigating the ASF/Combat 18, members of the ASF and Combat 18 regularly wear, in photos at group meetings and group exercises, patches showing membership within the organization. White Supremacist Extremist groups, such as ASF, will generate marks and insignias in an effort to maintain group solidarity.

21) ASF and Combat 18 members will also correspond via social media concerning group activities and membership and will regularly display their garments showing affiliation with the ASF or Combat 18.

*(December 4, 2016)*

22) On December 4, 2016, JUSTIN LOUGH, along with CONNOR DYKES, JOSHUA STEEVER and another ASF member ROB MCFALL, participated in a controlled delivery of simulated methamphetamine in the Scranton, Pennsylvania, area. The aforementioned individuals acted as security during the methamphetamine transaction that took place in a Sam's Club parking lot. For their services during the transaction, STEEVER, MCFALL, DYKES and LOUGH were each paid $1,000 cash. At the conclusion of the transaction, LOUGH, who was operating a 2005 tan Ford Escape with Virginia registration 8161PT, was surveilled by law enforcement while travelling to his residence. LOUGH was observed arriving at his residence at 10:02 pm on 12/4/16. LOUGH was observed exiting the 2005 Ford Escape and retrieving an unknown item from the rear of the vehicle and entering his residence at 417 Maple Ave Waynesboro, Virginia, through the front door.

*(January 17, 2017)*

23) On January 17, 2017, CONNOR DYKES, along with JOSHUA STEEVER, JUSTIN LOUGH, and JACOB ROBARDS, were involved in a controlled delivery of simulated methamphetamine.

24) DYKES, STEEVER, LOUGH and ROBARDS met in Lords Valley, Pennsylvania with ASF affiliates; LOUGH was observed driving his 2005 tan Ford Escape bearing Virginia license plate H8CH3VY.

27) DYKES, LOUGH, and ROBARDS provided security for the controlled delivery, while STEEVER and an ASF affiliate met with a FBI UCE in the parking lot. STEEVER delivered a dark duffel bag containing approximately 16 pounds of simulated methamphetamine to the FBI UCE. The FBI UCE handed over $10,000.00 in cash to be distributed among the ASF affiliates and the subjects.

28) The cash was pre-recorded by the FBI before payment to the subjects.

29) Surveillance video from Target, located at 155 Mountaineer Drive, Stroudsburg, Pennsylvania 18360, shows STEEVER, DYKES, ROBARDS and LOUGH purchasing Visa Prepaid cards at the conclusion of the controlled delivery of simulated methamphetamine.

30) Per FBI UCE reporting, ASF members have purchased Visa Prepaid cards as a down payment on illegal firearms purchases.

*(March 12, 2017)*

31) On March 12, 2017, JOSHUA STEEVER, HENRY BAIRD, AND JUSTIN LOUGH were involved in a controlled delivery of simulated methamphetamine to an FBI UCE originating in Harrisburg, Pennsylvania and ending in Hagerstown, Maryland.

32) On March 12, 2017, an FBI surveillance team surveilled STEEVER, along with BAIRD and LOUGH, drive south on I-81 in LOUGH'S 2005 Ford Escape from Harrisburg, Pennsylvania.

33) STEEVER, BAIRD and LOUGH delivered approximately 16 pounds of simulated methamphetamine to FBI UCE-2 at the Crosspoint Shopping Center located in Hagerstown, Maryland.

38) On March 30, 2017, FBI UCE-2 met with STEEVER, BAIRD, LOUGH, and an ASF affiliate at the El Rodeo Restaurant in Harrisburg, Pennsylvania.

39) During this meeting at the El Rodeo restaurant, STEEVER, BAIRD and LOUGH were requesting that FBI UCE-2 provide them with "clean" firearms not previously used in criminal activity. LOUGH specifically discussed his desire to obtain an AK style rifle and handguns.

41) FBI UCE-2 explained to STEEVER, BAIRD and LOUGH several times that the FBI UCE-2 had illegal work for the group and that the proceeds of that work could be used to purchase firearms from FBI UCE-2. FBI UCE-2 inquired of the group what specific criminal activities the members would be comfortable performing. Each of the individuals advised they would be willing to do anything. When told "anything" was a broad category, LOUGH stated he had engaged in more significant activities in Arizona. FBI UCE-2 asked LOUGH what he had done in Arizona, and LOUGH stated he stole cars, as well as cooking and running methamphetamine. In addition, LOUGH told FBI UCE-2 that if he needed someone to distribute methamphetamine in the area of Virginia where LOUGH resides (Waynesboro) LOUGH could provide this service.

*(April 7, 2017)*

43) On April 7, 2017, STEEVER, BAIRD and LOUGH were involved in a controlled drug and firearm delivery to FBI UCE-2 who was located in Hagerstown, Maryland.

44) The FBI UCE-2 confirmed that that STEEVER, BAIRD, and LOUGH would meet at the Dunkin Donuts located at 4212 Union Deposit Road, Harrisburg, Pennsylvania 17112.

45) FBI UCE-1 met STEEVER, BAIRD, and LOUGH at the above Dunkin Donuts at approximately 9 a.m. and provided them with a box of fifty (50) AR-15 lower receivers, four (4) Glock sear full auto inserts, and a bag of what was purported to be sixteen (16) pounds of methamphetamine.

46) FBI UCE-1 showed STEEVER, BAIRD, and LOUGH the items; each understood what the items were and agreed to transport the items to FBI UCE-2.

49) The purported methamphetamine was manufactured out of rock salt and bath salt and contains no real methamphetamine.

50) FBI UCE-1 placed the box of fifty (50) AR-15 lower receivers, four (4) Glock sear full auto inserts, and the 16 pound bag of purported methamphetamine into the back of LOUGH's 2005 Ford Escape, Virginia license tag H8CH3VY.

## Additional Information pertaining to JUSTIN LOUGH

59) Your affiant learned that on or about November 21, 2016 an FBI UCE met with ASF members STEEVER, ROBERT MCFALL, DYKES and LOUGH at the Cracker Barrel restaurant located near Exit 222 off Interstate 81 in Staunton, Virginia. The purpose of the meeting was to discuss whether the aforementioned individuals were willing to assist in the transportation of illegal contraband, specifically narcotics, in return for payment. The aforementioned individuals, including LOUGH, agreed to participate in the operation. LOUGH volunteered to utilize his Ford SUV for the transportation of the contraband, stating that he could be the driver.

60) According to reporting from the Waynesboro Police Department, in September 2010 JUSTIN LOUGH was a suspect in an investigation of white supremacist graffiti that was found in the city. Detectives from the Waynesboro Police Department interviewed LOUGH, and during the interview, detectives observed a confederate flag, a white power symbol flag, and a red, black and white swastika flag in his window. In addition they observed a no trespassing sign on the front door to the residence, and written on the sign were the words "Aryans only," a swastika, the numbers 38, 88, and "einreich ein volk."

While inside LOUGH's apartment the detectives observed LOUGH had several photographs of Adolf Hitler on display. LOUGH told the detectives that he has a strong belief in "keeping his bloodline pure" and that he claims a white supremacist ideology and has friends who believe the same. He denied having any associations with white supremacist organizations.

## CONCLUSION

64) Based upon the above information, your affiant believes that JUSTIN LOUGH attempted and/or conspired to unlawfully possess, distribute, and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code § 841 and

846; namely the attempt and conspiracy to possess and distribute methamphetamine, a schedule I controlled substance.

65) Based upon the above information, your affiant believes that JUSTIN LOUGH has transported, delivered, or received a firearm in interstate commerce which has not been properly registered, in violation of Title 26, U.S.C. § 5861 (j). 26 U.S.C. § 5845 – Definitions, explains that the term "firearm" includes "machinegun." A machinegun is defined as *"any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively. or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.*

66) Based upon the above information, your affiant believes that JUSTIN LOUGH has engaged in interstate travel in aid of racketeering activities, in violation of 18 U.S.C. 1952.

67) Based upon the above information, your affiant believes that JUSTIN LOUGH committed the offense of money laundering, in violation of Title 18, U.S.C. § 1956 (A)(3)(b). Your affiant believes that LOUGH violated 18 U.S.C. § 1956(A)(3)(b), Laundering of Monetary Instruments, by purchasing Visa Prepaid cards to disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity.

68) Based upon the above, your affiant has probable cause to believe that during the execution of a search warrant at and on the premises of:

**417 Maple Avenue Waynesboro, Virginia**

will result in the discovery of items enumerated on Attachment B.

69) Your affiant also believes that the ARYAN STRIKEFORCE is a criminal organization that has been used in an attempt and conspiracy to deliver controlled substances as well as AR-15 lower receivers in an attempt to earn money to acquire illegal firearms. As such, your affiant requests to seize all related materials relevant to the Aryan Strikeforce to show LOUGH's affiliation and membership within the organization.

## ATTACHMENT A

### Property to be searched

1) Premises located at 417 Maple Avenue, Waynesboro, VA. A white, two story residence with black shutters, brown shingled roof with the numbers "417" posted above the front porch entrance.

## ATTACHMENT B

## Particular Things to be seized

1) Cellular telephone(s) and/or portable cellular telephone(s), SIM cards, pre-paid calling cards, pre-paid cellular telephones, voice over IP (VOIP) communication devices and the accompanying bills, detailed call records, internet service contracts, e-mail account information, residential telephone account information and bills, and any electronic communications data stored therein, and;

2) Electronic equipment, such as computers, personal organizers, personal digital assistant (PDA), telex machines, facsimile machines, currency counting machines, pagers, telephone answering machines and related manuals used to generate, transfer, count, record and/or store information. Additionally, computer software, tapes and discs, audio tapes and the contents therein, containing the information generated by the aforementioned equipment, and;

3) Address and/or telephone books (written or typed by hand as opposed to printed commercially), including handwritten "owe sheets," rolodex indices and any papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers of co-conspirators, sources of supply, customers, financial institutions and other individuals of businesses with whom a financial relationship exists.

4) All related materials related to the group known as "Aryan Strikeforce," to include items such as patches, correspondence, papers, clothing, wall coverings, or items bearing the Aryan Strikeforce logo or other white-supremacist organizations, groups, or names.

5) Pre-recorded money provided to the subjects as a result of controlled deliveries of methamphetamine or firearms, as well as receipts indicating purchases of Visa Prepaid cards to support purchase of firearms from the UCE.

6) Any evidence related to the illegal trafficking of a schedule I controlled substance, namely methamphetamine, to include methamphetamine, packaging materials, scales, log books and ledgers, and U.S. currency.

184

---

[184] ECF No. 232-2

The search ultimately recovered methamphetamine and related drug paraphernalia, cell phones, and various items with either Nazi or ASF markings.[185]

It is well established that "when the crime under investigation is drug distribution, a magistrate may find probable cause to search the target's residence even without direct evidence that contraband will be found there."[186] "Evidence associated with drug dealing needs to be stored somewhere, and ... a dealer will have the opportunity to conceal it in his home."[187] "After all, a dealer could logically conclude that his residence is the best, and probably the only, location to store items such as records[,] ... cash, ... guns, ... and large quantities of drugs to be sold."[188] "Application of this inference is based on evidence supporting three preliminary premises: (1) that the person suspected of drug dealing is actually a drug dealer; (2) that the place to be searched is possessed by, or the domicile of, the dealer; and (3) that the home contains contraband linking it to the dealer's activities."[189]

---

[185]  ECF No. 232-3 at 4-5.

[186]  *United States v. Stearn*, 597 F.3d 540, 558 (3d Cir. 2010).

[187]  *Id.*

[188]  *Id.*

[189]  *Id.* at 559.

In this matter, the magistrate judge did not err in issuing the search warrant. It is evident that there was a "fair probability that contraband or evidence of a crime"[190] existed at 417 Maple Avenue, Waynesboro, Virginia.

The affidavit presented to the magistrate judge explained that the search expected to recover items tying Lough to the ASF; because there were social media postings that indicated Lough is a patched member of the ASF, there was surveillance of Lough wearing the ASF patch on his jacket; and that he has an ASF bumper sticker on his vehicle. In addition to Lough's contemporaneous ASF activities, the affidavit detailed Lough's historical involvement with the white supremacist movement. In a September 2010 interview with Waynesboro, Virginia police, detectives present in Lough's apartment observed that Lough had displayed photos of Adolf Hitler, a confederate flag, a white power flag, and a swastika flag. Additionally, the detectives saw posted on the apartment's front door a sign with the words "Aryans only," a swastika, the numbers 38 and 88, and "einreich ein-volk." Additionally, the affidavit detailed Lough's participation in an April 7, 2017 illegal firearm transaction.

Finally, the affidavit explicated that the search was designed to uncover methamphetamine and accoutrements that go along with drug trafficking, such as packaging materials, scales, logbooks, ledgers and currency. The affiant explained

---

[190] *Gates* 462 U.S. at 238.

that the Government had evidence of Lough's involvement with controlled purchases of simulated methamphetamine on multiple dates – December 4, 2016, January 17, 2017, and March 12, 2017. Lough often drove his personal vehicle, a tan Ford Escape, to the drug "runs." In addition, the affiant relayed that Lough had bragged to an FBI UCE[191] that he had previously "cooked" and "run" methamphetamine.

### C. Conclusion

For the reasons delineated above and set forth in considerable detail in the affidavit, I hold that the magistrate judge had a substantial basis for concluding that probable cause for the search of the Waynesboro, Virginia residence existed. The motion to suppress is therefore denied.

## V. CONCLUSION

For the stated reasons, the Defendants' Motions are denied. An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge

---

[191] UCE stands for Undercover Employee.