UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL NO. 4:17-CR-139-4 |
| | ) | |
| | ) | (BRANN, D.J.) |
| v. | ) | |
| | ) | (ARBUCKLE, M.J.) |
| JUSTIN DANIEL LOUGH, | ) | |
| Defendant | ) | |

MEMORANDUM FOR COVID-19 BAIL DECISION
*Defendant Lough's Motion for Bail, Doc. 403*

## I.   INTRODUCTION

Before this Court is Mr. Lough's Motion for Presentence Release (Doc. 403).
Along with the Motion, a Brief (Doc. 404), the required notice (Doc. 406) requesting
a hearing, and the Government's Brief in Opposition (Doc. 407) were filed. For the
reasons detailed in this Memorandum, the request for a hearing and release from
detention will be denied.

## II.   BACKGROUND & PROCEDURAL HISTORY

This case began with the indictment of six (6) people, including Justin Lough.
(Doc. 12). Mr. Lough had his Initial Appearance and Arraignment in front of Judge
Carlson on April 27, 2017. (Doc. 20). At that time, jury selection and trial were
scheduled for July 10, 2017, in Williamsport, Pennsylvania. (Doc. 21). Mr. Lough
remained detained pursuant to the presumption under 18 U.S.C. § 3142(e).

On May 5, 2017, Judge Brann issued a scheduling order, rescheduling, among other things, jury selection and trial for June 5, 2017. (Doc. 58). After Judge Brann granted ten (10) Motions to Continue jury selection and trial (Docs. 60, 76, 96, 110, 121, 172, 220, 298, 314, 335), trial was scheduled for August 5, 2019.

On August 29, 2017, Mr. Lough filed a Motion for Hearing Regarding Bail and Release (Doc. 98) and a Brief in Support (Doc. 99). I granted that Motion and scheduled a hearing regarding bail for September 25, 2017. (Docs. 100, 101). I presided over Mr. Lough's detention hearing on September 25, 2017. (Doc. 102). At that time, I found Mr. Lough's father to be an appropriate third-party custodian. (Doc. 104). However, after reviewing the evidence, I found the weight of the evidence against Mr. Lough to be persuasive. *Id.* I noted the evidence from the FBI undercover sting operation showing Mr. Lough's participation in at least four meetings designed to facilitate money laundering and the transportation and sale of methamphetamine and firearm parts. *Id.* I also noted that Mr. Lough's tattoos demonstrated a commitment to a lifestyle consistent with the strong evidence of repeated involvement of crime. *Id.* Thus, I ordered Mr. Lough remain detained. *Id.*

On October 6, 2017, Mr. Lough filed a Motion to Revoke Detention (Doc. 105). On October 27, 2017, Mr. Lough filed a Brief in Support (Doc. 112). The Government filed a Brief in Opposition on November 9, 2017 (Doc. 116). On November 16, 2017, Judge Brann, after conducting a de novo review of my detention

decision, issued an Order denying Mr. Lough's Motion to Revoke Detention. (Doc. 117). On November 21, 2017, Mr. Lough filed a Notice of Appeal of Judge Brann's decision to the United States Court of Appeals for the Third Circuit.[1] (Doc. 118). On January 25, 2018, the Third Circuit denied Mr. Lough's appeal.

On May 8, 2019, the Government filed notice that a plea agreement had been reached with Mr. Lough. (Doc. 337). On June 3, 2019, a change of plea hearing was held wherein Mr. Lough pled guilty as to Count 7 of the Indictment. (Docs. 343, 344). At this time, Mr. Lough has not been sentenced.

On April 20, 2020, Mr. Lough filed a Motion for Presentence Release (Doc. 403) and a Brief in Support (Doc. 404). That same day, I issued an Order instructing the parties to confer by telephone to determine if a joint resolution could be reached. On April 23, 2020, Mr. Lough filed Notice (Doc. 406) that a joint resolution could not be reached regarding his continued detention and requested an in-court hearing. On April 23, 2020, the Government filed a Brief in Opposition (Doc. 407).

## III.   COURT PROCEDURE FOR COVID-19 CASES

Anticipating a significant number of requests for reconsideration of bail in light of the COVID-19 pandemic, the Court instituted an expedited procedure to hear

---

[1] Mr. Lough's appeal of Judge Brann's bail decision to the Third Circuit can be found at Court of Appeals Docket Number 17-3555.

these cases in an orderly and deliberate fashion. The filing of a bail motion citing COVID-19 as a reason for release from detention will be specifically designated and a docket entry will automatically notify counsel about the expedited procedures. That entry was made in this case on April 21, 2020.

## IV.   STANDARD OF REVIEW

Mr. Lough has entered a guilty plea in this matter. Thus, Mr. Lough is no longer a pretrial detainee, as he is awaiting sentencing. Mr. Lough's continued detention is to be analyzed under 18 U.S.C. § 3143, which provides:

(a) Release or Detention Pending Sentence.—

(1) Except as provided in paragraph (2), the judicial officer shall order that a person who has been found guilty of an offense and who is awaiting imposition or execution of sentence, other than a person for whom the applicable guideline promulgated pursuant to 28 U.S.C. 994 does not recommend a term of imprisonment, be detained, unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c). If the judicial officer makes such a finding, such judicial officer shall order the release of the person in accordance with section 3142(b) or (c).

(2) The judicial officer shall order that a person who has been found guilty of an offense in a case described in subparagraph (A), (B), or (c) of subsection (f)(1) of section 3142 and is awaiting imposition or execution of sentence be detained unless—

> (A)
>> (i) the judicial officer finds there is a substantial likelihood that a motion for acquittal or new trial will be granted; or
>> (ii) an attorney for the Government has recommended that no sentence of imprisonment be imposed on the person; and
>
> (B) The judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community.

An individual detained under Section 3143 may challenge their detention under 18 U.S.C. § 3145(c), which provides in relevant part:

> A person subject to detention pursuant to section 3143(a)(2) or (b)(2), and who meets the conditions of release set forth in section 3143(a)(1) or (b)(1), may be ordered released, under appropriate conditions, by the judicial officer, if it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate.

18 U.S.C. § 3145(c).

## V.    REVIEW OF PREVIOUS BAIL DECISION

On August 29, 2017, Mr. Lough filed a Motion for Hearing Regarding Bail and Release (Doc. 98) and a Brief in Support (Doc. 99). I granted that Motion and held a hearing regarding bail for September 25, 2017. (Docs. 100, 101, 102). After the hearing, I ordered Mr. Lough remain detained. In support of that decision, I stated:

I carefully considered the evidence presented by proffer, the testimony of the defendant's father, and the eight exhibits proffered and accepted. I find the defendant enjoys a good reputation in his community, that he has strong family ties, that he has an opportunity for employment, that his father has the financial resources to support him while on bail and that he has been a long time resident of his father's community. I also find that there is no evidence of a history relating to drug or alcohol abuse except for the DUI in 2011. I find the defendant has a minor criminal history and his record of nonappearance is for a petty offense that was resolved by the court. Further, that at the time of the current offense, he was not on probation or parole or otherwise serving in a sentence. I also find that the father would be an appropriate third-party custodian who has both the ability and the willingness to serve.

However, I am persuaded by the weight of evidence against the defendant which included an FBI undercover sting showing that the defendant participated on at least four occasions in meetings designed to facilitate the transportation and sale of both methamphetamine and parts to convert weapons to automatic weapons. According to the proffered evidence the defendant also participated in the purchase of gift cards to launder cash proceeds from illegal drug and weapons transactions. The tattoos of the defendant show a commitment to a lifestyle consistent with the strong evidence of repeated involvement in crime in this case and inconsistent with his reputation in the community as evidence by the exhibits and testimony of his father.

(Doc. 104).

On October 6, 2017, Mr. Lough sought de novo review of my decision to detain him. (Doc. 105). On November 16, 2017, Judge Brann issued an Order denying Mr. Lough's Motion to Revoke Bail. (Doc. 117). Mr. Lough appealed Judge Brann's decision to the Third Circuit. (Doc. 118). The Third Circuit denied Mr. Lough's appeal on January 25, 2018.

## VI.    DISCUSSION OF THE COVID-19 PANDEMIC

We are mindful of the unprecedented magnitude of the COVID-19 pandemic and the extremely serious health risks it presents.[2] We are also cognizant that the President of the United States has declared a national emergency and that the Governor of the Commonwealth of Pennsylvania[3] has also declared a state of emergency to address the needs of the nation and the Commonwealth respectively. We also recognize that public health officials have strenuously encouraged the public to practice "social distancing," to hand-wash and/or sanitize frequently, and to avoid close contact with others—all of which presents challenges in detention

---

[2] World Health Organization, "WHO characterized COVID-19 as a pandemic" March 25, 2020, available at https://www.who.int/emergencies/diseases/novel-coronavirus-2019/events-as-they-happen

[3] Governor Thomas Wolf proclaimed the existence of a disaster emergency throughout the Commonwealth pursuant to 35 Pa.C.S. §7301(c) on March 6, 2020. He ordered all non-essential business in the Commonwealth to close on March 20, 2020, and he extended the closure of non-essential businesses and schools "indefinitely" to slow the progression of the pandemic. "Gov. Wolf and Sec. of Health Expand 'Stay at Home' Order to Carbon, Cumberland, Dauphin and Schuylkill Counties, Extend School Closures Indefinitely," March 30, 2020, available at https://www.governor.pa.gov/newsroom/gov-wolf-and-sec-of-health-expand-stay-at-home-order-to-carbon-cumberland-dauphin-and-schuylkill-counties-extend-school-closures-indefinitely/.  That Stay at Home Order was extended to all 67 counties on April 2, 2020 to be effective thru April 30, 2020. https://www.pa.gov/guides/responding-to-covid-19/#StayatHomeOrder (last accessed April 4, 2020).

facilities. *See United States v. Martin*, No. PWG-19-140-13, 2020 WL 1274857 *2 (D. Md. Mar. 17, 2020). As of April 4, 2020, 24 cases have been issued around the country citing *Martin*. Of the 24 cases that cite *United States v. Martin,* only three cases released the detainee, 20 cases detained the defendant, and one case granted bail review. In *United States v. Davis*, the judge denied the government motion for pretrial detention because the detention facility already had cases of COVID-19 and the individual was not a flight risk and posed no serious threat to the community. *United States v. Davis*, No. ELH-20-09, 2020 WL 1529158 (D.Md. Mar. 30, 2020). The case also relied heavily on expert opinion that pretrial facilities are poorly equipped to manage the highly contagious and potentially deadly coronavirus. *Id.* Two out of the three cases were people detained due to immigration proceedings. See *Basank v. Decker*, No. 20-cv-2518 AT, 2020 WL 1481503, (S.D.N.Y. Mar. 26, 2020) and *Coronel, et al. v. Decker, et al.*, No. 20-cv-2472 AJN, 2020 WL 1487274 (S.D. N.Y. Mar. 27, 2020). Additionally, there was one case that only granted review of bail hearings to be assessed on a case to case basis. See *Karr v. State*, No. 4FA-19-00872CR, 2020 WL 1456469 (Alaska Ct. App. Mar. 24, 2020).

In a precedential opinion analyzing a COVID-19 release request in the context of the compassionate release provisions of the First Step Act the Third Circuit concluded that COVID-19 risk alone does not require release where the prison system has a plan in place to deal with the pandemic.

We do not mean to minimize the risks that COVID-19 poses in the federal prison system, particularly for inmates like Raia. But the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread. *See generally* Federal Bureau of Prisons, *COVID-19 Action Plan* (Mar. 13, 2020, 3:09 PM), https://www.bop.gov/resources/news/20200313_covid-19.jsp. Given BOP's shared desire for a safe and healthy prison environment, we conclude that strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance. And given the Attorney General's directive that BOP "prioritize the use of [its] various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic," we anticipate that the exhaustion requirement will be speedily dispatched in cases like this one. Memorandum from Attorney Gen. to Dir., Bureau of Prisons 1 (Mar. 26, 2020), https://www.justice.gov/file/1262731/download. So we will deny Raia's motion.

*U.S. v. Raia,* 20-1033, slip op. at 8 (3d Cir. April 2, 2020)

On March 31, 2020, Judge Jones of this court ordered the immediate release of fourteen men and women held in ICE civil detention in Pike, Clinton and York County facilities. According to Judge Jones, "Each of the petitioners suffers from chronic medical conditions and faces an imminent risk of death or serious injury if exposed to Covid-19." *Thakker v. Doll*, 1:20-cv-0480, slip op. at 2 (M.D. Pa. March 31, 2020. Ruling on their habeas "conditions of confinement" petitions[4] he found

---

[4] Petitioners invoked the jurisdiction of the Court under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (original jurisdiction), 28 U.S.C. § 2241 (habeas

that "…a remedy for unsafe conditions need not await a tragic event." *Thakker v. Doll*, 1:20-cv-0480, slip op. at 6 (M.D. Pa. March 31, 2020). His review of the safety procedures at these three immigration facilities found they were insufficient to overcome the speculative risk of infection and death for an "imminent irreparable harm" finding in the TRO context.

> The Petitioners' claim is rooted in imminent, irreparable harm. Petitioners face the inexorable progression of a global pandemic creeping across our nation—a pandemic to which they are particularly vulnerable due to age and underlying medical conditions. At this point, it is not a matter of *if* COVID-19 will enter Pennsylvania prisons, but *when* it is finally detected therein. It is not unlikely that COVID-19 is already present in some county prisons—we have before us declarations that portions of the Facilities have been put under ineffective quarantines due to the presence of symptoms similar to COVID-19 among the inmate population. Indeed, we also have reports that a correctional officer at Pike has already tested positive for COVID-19. (footnotes omitted).
>
> . . . .
>
> Based upon the nature of the virus, the allegations of current conditions in the prisons, and Petitioners' specific medical concerns, detailed below, we therefore find that Petitioners face a very real risk of serious, lasting illness or death. There can be no injury more irreparable.

*Thakker v. Doll*, 1:20-cv-0480, slip op. at 8,9 (M.D. Pa. March 31, 2020).

Judge Jones cites several immigration detention cases where release has been ordered. *Thakker v. Doll*, 1:20-cv-0480, slip op. at 18-20 (M.D. Pa. March 31, 2020.

---

jurisdiction), and Article I, Section 9, clause 2 of the United States Constitution (the Suspension Clause) (Doc. 1, p. 6).

He balanced the public interest in continued detention this way: "Finally, the public interest favors Petitioners' release. As mentioned, Petitioners are being detained for civil violations of this country's immigration laws." *Thakker v. Doll*, 1:20-cv-0480, slip op. at 23 (M.D. Pa. March 31, 2020.

In concluding that immediate release was required in these fourteen cases Judge Jones said:

> In times such as these, we must acknowledge that the *status quo* of a mere few weeks ago no longer applies. Our world has been altered with lightning speed, and the results are both unprecedented and ghastly. We now face a global pandemic in which the actions of each individual can have a drastic impact on an entire community. The choices we now make must reflect this new reality.
>
> Respondents' Facilities are plainly not equipped to protect Petitioners from a potentially fatal exposure to COVID-19. While this deficiency is neither intentional nor malicious, should we fail to afford relief to Petitioners we will be a party to an unconscionable and possibly barbaric result. Our Constitution and laws apply equally to the most vulnerable among us, particularly when matters of public health are at issue. This is true even for those who have lost a measure of their freedom. If we are to remain the civilized society we hold ourselves out to be, it would be heartless and inhumane not to recognize Petitioners' plight.

*Thakker v. Doll*, 1:20-cv-0480, slip op. at 24 (M.D. Pa. March 31, 2020).

The language of this case is strong and persuasive in the civil detention context.[5]  However, to apply this reasoning to prisons and jails across the board in

---

[5] The Government appealed Judge Jones's decision to the Third Circuit and requested an administrative temporary stay. The Third Circuit granted the temporary

all criminal cases is a much different matter.  Different interests must be balanced when a criminal defendant has been detained only after a finding that no condition or combination of conditions will assure the presence of the defendant and the safety of the community. The balancing is likewise different when a criminal defendant is serving a sentence. The question of civil detention, early parole or compassionate release is not before me. This is a decision about bail during a pandemic.

I believe I must make an individualized determination as to whether COVID-19 concerns are compelling in a particular case to justify temporary release.

## VII.   FLIGHT RISK AND DANGER TO THE COMMUNITY

Mr. Lough remains a flight risk and a danger to the community. Mr. Lough is unable to prove by clear and convincing evidence that he is not likely to flee or pose a danger to the safety of the community if released.

Mr. Lough does not specifically address risk of flight. He does, however, provide a release plan, which I address later in this opinion.

Regarding flight risk, the Government argues:

---

stay request within hours. On April 21, 2020, the Third Circuit issued an Opinion concluding that it has jurisdiction to hear the Government's appeal of Judge Jones's decision. The Third Circuit will address the merits of the Government's appeal after the parties have had the opportunity to brief the issues. *See Hope v. Warden York County Prison*, No. 20-1784, 2020 WL 1922372 (3d Cir. Apr. 21, 2020).

> [Mr. Lough] faces over 30 years in prison under the current guidelines calculation and a mandatory minimum prison term of 10 years. He thus has a substantial motivation to flee, rather than appear at sentencing or surrender to serve a term of imprisonment. Moreover, the offense conduct that he admitted in pleading guilty involved interstate travel on multiple occasion to facilitate the goals of the criminal conspiracy. His criminal records and long history of drug and alcohol abuse make him an unacceptable supervision risk.

(Doc. 407, p. 34).

Regarding dangerousness, Mr. Lough argues:

> The factual proffer outlined above clearly establishes decreased risks to others. Specifically, Mr. Lough will occupy a private residence where he can be quarantined if necessary. There will be little to no need for him to interact with members of the public. Quite the opposite, unlike the current conditions at CCCF, he will not be interacting with numerous people who pass him during the day or occupy space less than six feet from him for a majority of the day and night.

(Doc. 404, p. 11).

Regarding dangerousness, the Government argues:

> The requirement under § 3143(a)(2) that Lough be detained pending sentence, following his conviction for a controlled substance violation carrying a 10-year mandatory minimum, reflects a legislative finding that the distribution of drugs like methamphetamine inherently poses a danger to the community. That presumptive risk of dangerousness is amply demonstrated in this case, which combines the volatile combination of interstate drug trafficking, the transport and acquisition of numerous firearms, including machine gun parts, and active participation in criminal activities with a group of individuals committed to using violence to pursue their white supremacist goals.[6]

---

[6] The Government reproduces the lengthy discussion of Mr. Lough's offense conduct, which is included in the Presentence Report and was presented at Mr. Lough's guilty plea hearing. (Doc. 407, pp. 10-23).

(Doc. 407, pp. 27-28).

I am particularly persuaded by the Government's argument regarding Mr. Lough's dangerousness. The Government provided a lengthy discussion of Mr. Lough's criminal history, particularly his activity with the Aryan Strike Force. I find Mr. Lough's activity with the Aryan Strike Force particularly troubling. The Government states that, "[a]ccording to its on-line mission statement, the ASF is a 'white nationalist organization' with the 'goal to protect the honour of our women, children and the future of our race and nation' using violence as a necessary tool to achieve its goals." *Id.* at p. 28. As a member of the Aryan Strike Force, Mr. Lough's criminal history allegedly included money laundering and the sale and interstate transport of methamphetamine and firearms.

I find the Government's arguments regarding flight risk and danger to the community to be persuasive. Thus, I find by clear and convincing evidence that Mr. Lough remains a flight risk and danger to the community.

## VIII. WHETHER EXCEPTIONAL REASONS EXIST WARRANTING PRESENTENCE RELEASE OF MR. LOUGH

I note at the outset that Mr. Lough has not alleged that there is a substantial likelihood that a motion for acquittal or new trial will be granted, nor are either likely as Mr. Lough pled guilty before his trial could begin. Mr. Lough seeks release due

to "exceptional reasons" under 18 U.S.C. § 3145(c). As noted above, I have already found that Mr. Lough remains a flight risk and danger to the community.

Mr. Lough fails to clearly show that there is an exceptional reason why his continued detention is inappropriate. Mr. Lough discusses the general dangers of COVID-19, the increased risks of COVID-19 transmissions in prisons, and how he is a high risk for infection based on his medical history.

### A. SPECIFIC HEALTH CONCERNS OF THIS DEFENDANT

Mr. Lough alleges that he is particularly vulnerable to COVID-19, specifically due to his asthma. Mr. Lough alleges:

> Mr. Lough's asthma condition was diagnosed approximately six months after his birth when he was hospitalized after an asthma attack and nearly died. It was around that time that he was also hospitalized for, and nearly died from, viral meningitis. Throughout his life, before incarceration, Mr. Lough utilized an inhaler for his asthma condition. Nevertheless, before his arrest in 2017, he had been hospitalized on multiple occasions for asthma attacks, the last even occurring not long before April 11, 2017. This makes Mr. Lough vulnerable to serious illness or death should he be exposed to COVID-19 while at the CCCF.

> . . . .

> The factual proffer outlined above establishes that release from CCCF will mitigate the overall COVID-19 risks, while continued incarceration will, on the other hand, exacerbate the risks. Mr. Lough will be in the home of his father, and no one else, and he will not be forced to share space with others who are less than six feet from him. Furthermore, Mr. Lough will reside in a location that places him near his family doctor and hospital.

(Doc. 404, pp. 4, 11).

We remain sympathetic to Mr. Lough's concerns regarding COVID-19 and the possibility of health complications, but "[s]uch speculation does not constitute a 'compelling reason' for temporary release." *United States v. Loveings*, Cr. No. 20-0051, 2020 WL 1501859, at *3 (W.D. Pa. Mar. 20, 2020). District courts in the Third Circuit have reached that same conclusion regarding temporary release even in cases where the defendant indicated respiratory conditions. *United States v. Pritchett*, CR 19-280, 2020 WL 1640280, at *3 (W.D. Pa. Apr. 2, 2020) (despite being sympathetic to defendant's medical conditions, including asthma, speculation concerning possible future conditions in jail does not constitute a "compelling reason" for temporary release.); *United States v. Jones*, 2:19-CR-00249-DWA, 2020 WL 1511221, at *3 (W.D. Pa. Mar. 29, 2020) (holding that while the defendant suffered from hypertension, sleep apnea, and asthma – respiratory issues making the defendant at a higher risk for COVID-19 – his present health conditions were not sufficient to establish a compelling reason for release in light of the danger to the community posed by his release and the efforts undertaken at the jail to combat the spread of the virus). I do not find Mr. Lough's argument regarding his specific health issues to be sufficient to establish a compelling reason for release.

### B. SPECIFIC CONDITIONS IN THE PLACE OF DETENTION

"The Court is mindful that it bears a fiduciary responsibility to those that are detained in jails and prisons. The incarcerated look to the Courts for protection of

their health, welfare and personal rights in general. However, the Courts are not on the front line. That space is rightly occupied by corrections officials and their administration."[7] The Chief Judge of this Court issued Standing Order 20-5 on March 25, 2020, requiring all detention facilities where persons are being held by order of this court to notify the Chief Judge and the judicial officer who signed the detention order if a federal detainee is in medical isolation or quarantine for any reason.[8] As of the filing of this Opinion, no notice has been received from Clinton County Correctional Facility that Mr. Lough is in medical isolation or quarantine for any reason.

The Government provided a memorandum from Clinton County Correctional Facility detailing the steps taken to protect inmates and staff from COVID-19. (Doc. 409). These precautions seem to be consistent with the CDC Guidelines for

---

[7] *United States v. Williams*, No. PWG-13-544, 2020 WL 1434130 (slip copy) (D. Md. Mar. 24, 2020).

[8]     "…Further, each detention center shall promptly notify the Marshal for this District of any federal detainee who is in medical isolation or quarantine at their facility for any reason, promptly upon the entry of such detainee into such status. The Marshal shall then so notify the undersigned and the judicial officer who entered the Order of commitment of such status.
     The Clerk's Office is DIRECTED to transmit a copy of this Order to the U.S. Marshal, who shall advise each involved detention center of its content, and who shall provide a copy of same to each detention center and each relevant law enforcement agency."
     Standing Order 20-5, https://www.pamd.uscourts.gov/news/standing-order-2020-005 (last accessed April 4, 2020).

Detention Facilities.[9] The Pennsylvania Supreme Court issued an Order on April 3, 2020 directing each county president judge to work with the relevant stakeholders to fashion localized plans for dealing with COVID-19 in county jails:

> We DIRECT the President Judges of each judicial district to coordinate with relevant county stakeholders to ensure that the county correctional institutions in their districts address the threat of COVID-19, applying the recommendations of public health officials, including the CDC's Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (Mar. 23, 2020). If utilization of public health best practices is not feasible due to the population of the county correctional institutions, President Judges should consult with relevant county stakeholders to identify individuals and/or classes of incarcerated persons for potential release or transfer to reduce the current and future populations of the institutions during this health crisis with careful regard for the safety of victims and their communities in general, with awareness of the statutory rights of victims, and with due consideration given to public health concerns related to inmates who may have contracted COVID-19. Moreover, consistent with these above considerations, President Judges are to undertake efforts to limit the introduction of new inmates into the county prison system.[10]

There is nothing before this Court to indicate that any specific problem has developed at Clinton County Correctional Facility.

---

[9]       http://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/ guidance-correctional-detention.html.

[10] *In Re: The Petition Of The Pennsylvania Prison Society*, No. 70-MM-2020, slip op. at pp. 2-3 (Pa. April 3, 2020) (per curiam).

## C.  Number of Confirmed Cases

Based on the evidence before me at this time, there are zero (0) confirmed cases of COVID-19 in Clinton County Correctional Facility. In all of Clinton County, where the prison is located, there are thirty (30) confirmed cases and zero (0) deaths, as of 11:00 a.m. today (April 29, 2020). While these numbers are not guaranteed into the future, they do not suggest an immediate and unavoidable risk. The location of Mr. Lough's release plan (his father's home) appears to have similar COVID-19 statistics. Mr. Lough seeks release to his father's home in Waynesboro, Virginia. Waynesboro is an independent city in Virginia. In the City of Waynesboro alone, there are eleven (11) confirmed cases. Waynesboro is surrounded by Augusta County. In August County, there are forty-one (41) confirmed cases and one (1) death.

## D.  Release Plan

Mr. Lough requests release to his father's home. Regarding his father, Mr. Lough states:

> Mr. Lough's father, Jack Lough, lives in Waynesboro, Virginia. It is a single-house property and there are two bedrooms on the second floor, one of which Mr. Lough could occupy for a period of 14 days, if he were to be ordered to be quarantined as a condition of his release. Furthermore, because Jack Lough is legally blind, other persons handle nearly all of his outside errands and the items are left on his back porch for him, by the couriers, who never enter the home. Finally, Jack Lough lives alone and there is no expectation that anyone will be visiting at any time in the future.

Jack Lough has promised to act as third-party custodian, and obey all rules of court and probation, if the Court designates him as Mr. Lough's custodian pending Mr. Lough's sentencing hearing.

Mr. Lough's family doctor, and the family hospital, are located near Jack Lough's house in Waynesboro, Virginia.

(Doc. 404, pp. 4-5).

It appears that Jack Lough would be an appropriate third-party custodian, but I do not find that presentence release of Mr. Lough is appropriate at this time.

## IX.    CONCLUSION

For all of the reasons set forth above, Mr. Lough has failed to demonstrate that he should be released presentencing. Therefore, his Motion for Release (Doc. 403) will be denied. An appropriate order follows.

Date: April 30, 2020                           BY THE COURT

                                               _s/William I. Arbuckle_
                                               William I. Arbuckle
                                               U.S. Magistrate Judge